WINDING GULF COLLIERY CO. v. BRAST.
SUPERIOR POCAHONTAS COAL CO. v. SAME.

District Court, N. D. West Virginia.
Feb. 19, 1936.

Greever & Gillespie, of Tazewell, Va., for plaintiffs.

Arthur Arnold, U. S. Atty., of Parkersburg, W. Va., Wm. C. Howard, Asst. U. S. Atty., and T. H. Lewis and E. J. Dowd, both of Washington, D. C., for defendants.

BAKER, District Judge.

By stipulation, these cases are submitted to the court to decide and determine all issues of fact as well as law; a jury being waived.

This memorandum is to be considered in both the above-styled cases, for the reason that each case is brought to recover overpayments of taxes, and both involve the same legal proposition. In each case the amount sued for is the excess in taxes claimed to have been paid by the plaintiffs by reason of the refusal of the Commissioner to allow proper deductions from income. The deductions claimed in each case are specifically set out in the respective declarations, and the revisions thereof are set out in the stipulations filed and disclaimers made at the trial.

The plaintiffs assert that the claimed deductions should have been allowed because they are made up of items of expenditure that did not increase production, decrease the cost of production, or add to the value of the mine. The defendant's contention in each case is that the items set out should be charged to "capital investment," and are therefore not deductible.

At the trial of this case, the following stipulations were made upon the record:

"1. Winding Gulf Colliery Company, a corporation, plaintiff in this action, is a corporation chartered, organized and existing under the laws of the State of West Virginia; the defendant, Edwin A. Brast, is a resident of the City of Parkersburg, County of Wood, State of West Virginia, and was, at the time this action was instituted, Collector of Internal Revenue for the Collection District of West Virginia.

"2. On or before March 15th, 1920, plaintiff duly made and filed in the Office of the Collector of Internal Revenue for the Collection District of West Virginia, at Parkersburg, S. A. Hays being then Collector, its return of corporation income and profit taxes for the calendar year 1919.

"3. On the 24th day of May, 1922, plaintiff filed its amended return with A. B. White, then Collector of Internal Revenue for said District.

"4. Said original return showed the amount of taxes due from the plaintiff for the year 1919 to be $9,330.59, which amount plaintiff paid in full during the year 1920 to S. A. Hays, then Collector of Internal Revenue.

"5. In said original return, the taxable net income was shown to be $95,305.87, while in said amended return, the taxable net income was shown to be $86,804.85.

"6. The taxes shown to be due under said amended return were $8,480.49, or $850.10 less than the taxes shown by said original return.

"7. After both said original and amended returns had been made and duly filed, and the taxes due as shown by said original return, had been paid as aforesaid, the Commissioner of Internal Revenue audited and revised said return and said amended return, and by letter dated August 24th, 1925, advised plaintiff that he had determined that there was a deficiency for the year 1919 in the sum of $18,400.10, in excess of the amount of income and profits tax returned by the plaintiff on the original return, which said letter is herewith filed as a part hereof, marked 'Exhibit No. 1.'

"8. The plaintiff filed a claim for refund on November 8th, 1929, for $15,669.29, representing a part of the payment of said additional tax of $14,225.84, and interest thereon in the sum of $973.79, which said claim for refund was rejected by the Commissioner on schedule dated March 7th, 1930. The Commissioner, in making the redetermination aforesaid, disallowed as expenses certain items of expenditure for plant equipment, amounting to $57,884.93, being certain items which the plaintiff had treated as expenses in its original return. The amount of such items set forth in the claim for refund is $68,432.11. The difference between these two figures is accounted for by the fact that the plaintiff did not charge off its books during 1919 certain items of expenditure for plant equipment and structures which are included in the claim for refund, along with the $57,884.93.

"9. The items of expenditure set out in said claim for refund, and which the plaintiff contends were proper deductions from its gross income, are as follows: Steel rails, in the amount of $5,741.82; enlarged power plant, in the amount of $32,852.47; compressor and drills in the amount of $3,890.50; mine machines, in the amount of $10,500.00; mine locomotives, in the amount of $4,900.15; addition to blacksmith shop, in the amount of $971.54; washhouse No. 1, in the amount of $67.76; water filter, in the amount of $8,121.49; oil house in the amount of $48.93; oil shed, in the amount of $55.78; and addition to domestic coal bin, in the amount of $1,281.67, being a total of $68,432.11. All of these items were bought and paid for by the plaintiff during the year 1919. Those of the said items which the plaintiff failed to charge off on its books for the year 1919, and which account for the difference between the deductions of $57,884.93 and the $68,432.11, the total of said deductions set out in the claim for refund, are as follows: Blacksmith shop No. 2, $971.54; Washhouse No. 1, $67.76; water filter, $8,121.49; oil house, $48.93; oil shed, $55.78; and domestic coal bin, $1281.67. Said claim for refund was filed on November 18th, 1929, and a copy thereof is hereto attached and filed as a part hereof, marked 'Exhibit No. 2.'

"10. On or before the 15th day of March, 1921, plaintiff duly made and filed in the office of the Collector of Internal Revenue for the Collection District of West Virginia, at Parkersburg, S. A. Hays being then Collector, its return of corporation income and profits taxes for the calendar year 1920.

"11. On the 24th day of May, 1922, plaintiff filed its amended return with A.

B. White, then Collector of Internal Revenue for said District, for said calendar year 1920.

"12. Said original return showed the amount of taxes due from the plaintiff for the year 1920 to be $205,548.95, which amount the plaintiff paid in full during the year 1921; that is to say, it paid to S. A. Hays, Collector, on March 15th, 1921, $51,387.24, and the balance to the said A. B. White, then Collector of Internal Revenue, as successor to the said S. A. Hays.

"13. In said original return, the taxable net income of the plaintiff was shown to be $588,869.86, while in said amended return, the taxable net income was shown to be the sum of $572,902.14.

"14. The net income and taxes shown in said amended return were determined by the plaintiff by deducting from its gross income, among other things, certain expenditures for plant equipment and structures, being a total of $61,348.30, all of which items of plant equipment and structures were bought and paid for by the plaintiff during the year 1920.

"15. Ater both of said returns had been made and duly filed, and the taxes due, as shown by said original return, had been paid as aforesaid, the Commissioner of Internal Revenue audited and revised said return and said amended return, and by letter dated August 24th, 1925, advised plaintiff that he had determined that there was a deficiency for the year 1920 in the sum of $36,847.76, in excess of the amount of income and profits taxes returned by the plaintiff on its original return, which said letter is the one heretofore filed, marked 'Exhibit No. 1.'

"16. The plaintiff filed a claim for refund on November 18th, 1929, for $21,202.93, being a part of the payment of the said additional tax of $29,024.84, and of the interest of $1,986.81, which said claim for refund was rejected by the Commissioner on schedule dated March 7th, 1930. The Commissioner, in making the redetermination as aforesaid, disallowed as expenses the above named items of expenditure for plant equipment and structures, in the amount of $40,419.30, being certain items which the plaintiff had treated as expenses in its amended return. The amount of items set forth in the claim for refund is $61,348.30. The difference between these two figures is accounted for by the fact that the plaintiff did not charge

off on its books during the year 1920 certain items of expenditure for plant equipment and structures which are included in the claim for refund along with the $40,419.30. Said claim for refund was filed on November 18th, 1929, and a copy thereof is hereto attached and filed as a part hereof, marked 'Exhibit No. 3.'

"17. The items of expenditure set out in said claim for refund, and which the plaintiff contends are proper deductions from its gross income, are as follows: Steel rails, $2,535.64; mine machines, $8,250.00; mine locomotives, $23,159.41; automobiles and trucks, $786.00; car puller, $456.50; hoist incline, $4,554.25; mine fans, $1,600.00; electric plugger, $320.00; addition to blacksmith shop No. 2, $1,508.73; addition to machine shop, $17,541.99; addition to mine foreman's office No. 2, $635.78, being a total of $61,348.30. All of these items were bought and paid for by the plaintiff during the year 1920. Those of said items which the plaintiff failed to charge off on its books for the year 1920, and which accounts for the difference between the deductions of $40,419.30 and the $61,348.30, the total of said deductions set out in the claim for refund, are as follows: Automobile and trucks, $786.00; car puller, $456.50; additions to blacksmith shop No. 2, $1,508.73; additions to machine shop, $17,541.99; and addition to mine foreman's office No. 2, $635.78.

"18. On or before March 16th, 1926, plaintiff duly made and filed in the office of the Collector of Internal Revenue for the Collection District of West Virginia, at Parkersburg, the defendant, Edwin A. Brast, being then Collector, its return of corporation income and profits taxes for the calendar year 1925.

"19. Said return showed the amount of taxes due from the plaintiff for the year 1925 to be $7,220.15, the full amount of which sum the plaintiff paid to the said Edwin A. Brast, then Collector of Internal Revenue, of which amount $5,470.18 was refunded to the plaintiff, leaving a balance of said payment of $1,749.97, of which $1,732.84 was paid March 16th, 1926, and the balance paid June 12th, 1926.

"20. Said return showed the taxable net income of the plaintiff to be $55,539.61, which was afterwards reduced by the Commissioner to the sum of $27,394.97, upon the making of which reduction in net income the said refund of $5,470.18 was made.

"21. The plaintiff filed a claim for refund on November 18th, 1929, for the sum of $1,749.97, the difference between the amount of taxes it had paid for the year 1925 and the refund, to both of which reference has been made above. A copy of said claim for refund is attached hereto and made a part hereof, marked 'Exhibit No. 4.'

"22. Said claim for refund was rejected by the Commissioner by letter dated June 7th, 1930, to the plaintiff, a copy of which said letter is filed herewith and as a part hereof, marked 'Exhibit No. 5.'

"23. Said claim for refund was based upon the contention that plaintiff's income for the year 1925 should have been reduced by certain deductions which it had failed to make on its books for expenditures in plant and equipment, the items of which are as follows: Steel ties, $1,358.27; 60 pounds steel rail, $1,063.35; strengthening and enlarging tipple No. 1, $35,064.11; substation, $18,366.58; and replacing saw-mill motor, $1,412.30; making a total of $57,264.61. All of these items were bought and paid for by the plaintiff during the year 1925.

"24. On or before March 16th, 1927, the plaintiff made and filed, in the office of the Collector of Internal Revenue for the Collection District of West Virginia, at Parkersburg, the defendant, Edwin A. Brast, being then Collector, its return of corporation income and profits taxes for the calendar year 1926.

"25. Said return showed the amount of taxes due from the plaintiff for the year 1926 to be $24,053.56, the full amount of which the plaintiff during the year 1927 paid to the said Edwin A. Brast, then Collector of Internal Revenue for the Collection District of West Virginia.

"26. The Commissioner, in revising the return so filed by the plaintiff for the calendar year 1926, determined the true amount of taxes due from the plaintiff for that year was the sum of $25,327.58, and made an additional assessment of $1,274.02, and interest thereon, amounting to $103.39, which last two amounts were paid by the plaintiff on April 27th, 1929, to the defendant.

"27. The plaintiff filed a claim for refund on November 18th, 1929, for the sum of $12,114.63. A copy of said claim for refund is attached hereto and made a part hereof, marked 'Exhibit No. 6.'

"28. Said claim for refund was rejected by the Commissioner, by letter dated June 7th, 1930, to the plaintiff, a copy of which said letter is filed herewith, as a part hereof, marked 'Exhibit No. 7.'

"29. Said claim for refund was based upon the contention that plaintiff's income for the year 1926 should have been reduced by certain deductions which it had failed to make on its books for expenditures in plant and equipment, the items of which are as follows: Steel rail, $4,443.95; automobiles and trucks, $1,731.25; mine cars, $5,816.26; steel ties, $1,041.70; railroad siding, $3,913.72; mine pumps, $3,689.62; equipment on tipple No. 2 $17,402.83; equipment on tipple No. 4, $21,710.75; addition to structure on mine tipple No. 2, $5,178.77; and addition to structure on mine tipple No. 4, $20,344.76, aggregating the total amount of $85,273.61. All of these items were bought and paid for by the plaintiff during the year 1926.

"30. The full amounts assessed against plaintiff by the Commissioner were paid as follows: March 16, 1927, $6,013.39; June 11, 1927, $6,013.39; September 14, 1927, $6,013.39; December 13, 1927, $6,013.39; and April 27, 1929, $1,274.02 and $103.39 interest, of which amounts $1,709.77 was, prior to the beginning of this action, refunded to the tax-payer.

"31. The books of the company were kept and the returns made on the accrual basis.

"32. The plaintiff withdraws and waives the following items of its claim herein asserted, set forth in the declaration and in the account filed therewith, and described in said account as follows:

For the year 1919:
(a) 'Water filter ......................... $ 8,121.49'
(b) 'Addition to domestic coal bin........ 1,281.67'

For the year 1920:
(c) 'Automobiles and trucks.............. 786.00'
(d) 'Addition to Blacksmith Shop No. 2.. 1,508.73'
(e) 'Addition to machine shop............ 17,541.99'
(f) 'Addition to Mine Foreman's Office No. 2 ............................... 635.78'

For the year 1925:
(g) Of the item 'Replacing saw-mill motor, $1,412.30,' a part is for a planer and matcher, which part is disclaimed in the sum of............... 668.80

For the year 1926:
(h) Of the item 'Automobile and trucks, $1,731.25,' a part is for an automobile for use of the General Manager, which part is disclaimed in the sum of........................ 966.75
(i) 'Railroad Siding ..................... 3,913.72' "

During the progress of the trial certain items included in the declaration and bill of particulars were disclaimed by Plaintiffs. The balance due and balance claimed by plaintiff Winding Gulf Colliery Company is set out in Plaintiff's Exhibit No. 20, and the amount for which it asks judgment is as follows:

**1919**

**WINDING GULF COLLIERY COMPANY—BLUEFIELD, W. Va.**

Recomputation of Tax after eliminating from claims items as follows:

|  | Cost | Dep. Taken |
|---|---|---|
| Blacksmith Shop No. 2 | $ 971.54 | $ 30.12 |
| Wash House No. 1 | 67.76 | 2.19 |
| Water Filter | 8,121.19 | 251.77 |
| Oil House | 48.93 | 1.51 |
| Oil Shed | 55.78 | 1.73 |
| Domestic Coal Bins | 1,281.67 | 39.73 |
|  | $10,547.17 | $ 326.96 |

| | |
|---|---|
| Net taxable income per claim | $80,871.41 |
| Add: Items above | 10,547.17 |
| | $91,418.58 |
| Less: Depreciation taken | 326.96 |
| Adjusted Taxable Income | $91,091.62 |
| { Excess Profits credits in } { excess of Income } | |
| Less Exemption | $ 2,000.00 |
| | $89,091.62 |
| Tax on above at 10% | 8,909.16 |
| Tax Previously assessed | 23,556.43 |
| Overassessment for 1919 | $14,647.27 |

**1920**

**WINDING GULF COLLIERY COMPANY—BLUEFIELD, W. Va.**

Recomputation of Tax after eliminating items expensed as below renumerated.

| | | |
|---|---|---|
| Net Taxable income—Per claim | | $587,168.42 |
| Add—Automobile | $ 786.00 | |
| Machine Shop | 17,541.99 | |
| Mine Foreman Office No. 2 | 635.78 | |
| Blacksmith Shop No. 2 | 1,508.73 | 20,472.50 |
| | | $607,640.92 |
| Less Depr. on items above | | 648.01 |
| Taxable Income Adjusted | | $606,992.91 |
| Invested capital per claim filed | | $1,103,758.94 |
| Adjustment 1919 Taxes | | |
| Tax redetermined in 1919 claim | $ 7,887.14 | |
| Tax redetermined by adjustments | 8,909.16 | 430.66 |
| Reduction at .4214 | $ 1,022.22 | $1,108,328.28 |
| Adjustment for 1919 Income | | |
| 1919 income adjusted | $91,091.62 | |
| Income per claim | 80,871.41 | 10,220.21 |
| Adjusted invested capital 1920 | | $1,118,548.49 |
| Excess Profit Credit—8% of Invested Capital | | 89,483.88 |
| Exemption | | 3,000.00 |
| | | $ 92,483.88 |

20% of Inv. Capital $223,709.70—$92,483.88—$131,225.82

| | |
|---|---|
| Tax on $131,225.82 at 20% | 26,245.16 |
| Total income... $606,992.91 | |
| Less 223,709.70 | |
| $383,283.21 Taxes at 40% | 153,313.28 |
| Total Excess Profit Tax | $179,558.44 |
| Net income— $606,992.91 | |
| Less—U. S. Int. $ 1,051.66 | |
| Profit Tax 179,558.44 | |
| Exemption 2,000.00 | 182,610.10 |
| Tax at 10% $424,382.81 | 42,438.28 |
| Total Tax | $221,996.72 |
| Tax previously assessed | $234,573.79 |
| Overassessment after eliminating above items | $ 12,577.07 |

**1926**

**WINDING GULF COLLIERY COMPANY**

Recomputation of Tax after eliminating from claim for refund items claimed as expense, listed below:

| | | |
|---|---|---|
| Net Income shown in claim | | $ 97,873.68 |
| Add—Automobile | $ 966.75 | |
| Virginia Siding | 3,913.72 | |
| No. 2 Tipple Equipment | 17,402.83 | |
| No. 4 Tipple Equipment | 21,710.75 | |
| No. 2 Tipple Structure | 5,178.77 | |
| No. 4 Tipple Structure | 20,344.76 | |
| Net Loss 1924 Eliminated | 9,801.99 | |
| Net Loss 1925 Eliminated | 7,333.20 | 86,652.77 |
| | | $184,526.45 |
| Less—Depreciation on Items eliminated on claims in prior years | | 13,565.75 |
| Adjusted taxable Income | | $170,960.70 |
| Tax on above at 13½% | | $ 23,079.69 |
| Taxes previously assessed | | 25,327.58 |
| Overassessment per adjusted claim | | $ 2,247.89 |
| Less Refund 1926—Recd. Aug. 19, 1930 | | 1,606.38 |
| Net Overassessment | | $ 641.51 |

The balance claimed by the plaintiff Superior Pocahontas Coal Company, a corporation, is $4,088.45, for which amount it asks judgment.

What is the straight edge by which these claims shall be governed? What is the law governing this controversy? The law is well settled in this circuit in the case of Marsh Fork Coal Co. v. Lucas (C.C.A.) 42 F.(2d) 83, 84, and in the cases of United States v. Roden Coal Co., 39 F.(2d) 425 (5 C.C.A.), and Commissioner of Internal Revenue v. Brier Hill Collieries, 50 F.(2d) 777 (6 C.C.A.).

In the opinion of Judge Parker in the Marsh Fork Coal Co. Case, supra, I find the clearest statement of the law as follows:

"This is a petition to review a decision of the Board of Tax Appeals reported in 11 B.T.A. 685. A number of questions were decided by the Board, but only one is presented to us by the petition, i. e., whether the Board was correct in refusing to allow petitioner to deduct from gross income for the year 1920 expenditures amounting to $28,895.85 for electric locomotives, mine cars, and steel rails. The Board held that these were capital expenditures, and refused to allow their deduction. Petitioner contends that they were not capital expenditures, as they did not increase output, decrease cost of production, or add to the value of the mine, but were made solely to maintain normal production, and were properly treated as maintenance items which should be charged to operating expense and deducted from gross income.

"At the time of the expenditures, petitioner's mine had been fully developed, and had been operated for a number of years. Workings had reached a distance of one and one-half miles from the head house, and more cars, locomotives, and trackage were necessary to maintain the normal output. The normal life of all of the equipment purchased exceeded one year, that of the cars being about five years, and that of the electric locomotives from eight to ten years. Petitioner contends that, although this is true, the purchase of the equipment did not add, and was not intended to add, anything to the value of the mining property, that its purchase was made necessary by the removal of the coal and the recession of the working faces; and that its installation was nothing more than an expense incident to the removal of the coal. We agree with the contention of petitioner. * * *

"Ordinarily it is true that the purchase of machinery having a life greater than one year is to be charged to capital and not to expense, for ordinarily such machinery is purchased either to increase production or to decrease cost and in either event to add to the value of the property. Expenditures such as those here involved, however, are not made either to increase production or to decrease cost of operation. They do not add to the value of the property, and are not made for that purpose. They are made solely for the purpose of maintaining the capacity of the mine as the working faces of the coal recede. They represent the cost, as it were, of bringing forward the working plant of the operator, which is made necessary as the coal is removed from the mine and the tunnels increase in length.

"It is possible, of course, to think of the increased trackage and the increased number of mine cars and locomotives made necessary by the lengthening tunnels as an increase of the capital investment in the mine; but the trouble is that this theory leads to the ridiculous result that, with the increase of investment, the property becomes less valuable, and that, when the investment is complete, the property is practically worthless. It is much more reasonable, we think, to consider expenditures for trackage, cars, and locomotives to maintain normal output as being an expense necessitated by the removal of the coal which has lengthened the tunnels, and an expense which, in any fair system of accounting, should be charged against the coal so removed.

"When an operator has removed sufficient coal to extend his tunnels so that he cannot maintain production with the equipment which he has, he must as a matter of course lay down more track and put in more cars and locomotives. The question is, Shall the expense thereby incurred be charged against the coal, the removal of which necessitated the expenditure to maintain normal operation, or against the coal yet unmined? We think it is but fair to charge against the coal which has been mined the expense which its removal has necessitated. We think, also, that this is the only practicable method of accounting. To capitalize the expenditures made to maintain normal output means that the cost of removal is pyramided against the coal farther back in the mine, with the result that the coal nearest the head house will appear to have been mined at abnormal profit and that farther back at a loss.

"The fact that the trackage laid and the cars and locomotives installed may last for a number of years is, we think, immaterial. However long they may last in the mine, they are but maintaining the mine's capacity, which would otherwise have been impaired by the lengthening of the tunnels due to the removal of the coal. While not repairs, they are in the nature of repairs, in that they are necessary to maintain the operation of the mine at the level of normal production. As suggested by counsel, a new axle on an automobile is no less a repair and chargeable to expense because it has a normal life of more than a year."

No appeal was taken from this decision of the Fourth Circuit Court of Appeals, yet there is an apparent attempt in these cases to have this court overrule the Marsh Fork Case.

Assuming, as I do, the law to be settled in the Fourth Circuit, we will proceed to consider the specific items involved herein.

### Winding Gulf Colliery Company Case.

In the beginning it is necessary to have in mind that in the life of a coal mine there are three distinct periods; namely, the planning period, the development period, and the operating period.

The planning period is the period in which all of the factors entering into the production of coal in a given tract of land are taken into consideration, and a plan evolved for the economic mining of that coal.

The development stage or period is that period in the life of the mine when it is being opened and expanded, so as to attain the desired and planned output. This period includes the installation of machinery, grading, and various other means of development, in order that the mine may be rendered capable of producing predetermined output.

The operating stage, or operating period, is that period of the life of the mine following the development period, during which the mine operates in accordance with its planned development.

These practices involving the planning, development, and operating periods are recognized and in general use in the coal industry in West Virginia.

In determining the issues in these cases, it is important to know when the mines of the plaintiffs completed the development period and passed into the operating period. This has been fixed by two witnesses, without contradiction: Mr. Epperly and Mr. Berkeley. They both stated that the development period ended and the operating period began in 1916.

Did the plaintiffs actually expend the various amounts of money claimed as deductions when such expenditures were made? And what articles of equipment were thereby purchased?

These questions are settled by the stipulation of the parties. There is therefore no dispute as to the correctness of the amounts, the time when they were expended, or as to what they bought.

The next question is when the articles of equipment so purchased were installed and actually put in use. Mr. Epperly testified as to all the years beginning with 1920 and ending in 1926, and he stated: "The equipment as purchased in those years was immediately placed in service, and structures in use." As to the purchases made in 1919, Mr. Berkeley testified that he was then in charge of the mine and made the purchases, and that the equipment so purchased was put into use in that year. There is no evidence to the contrary, so it is conclusively shown that the articles of equipment mentioned in the stipulation were actually bought, paid for, and installed in the years in which the stipulation shows the expenditures were made.

The next question is whether or not the purchases so made were for those things necessary to maintain production, or whether or not they were intended to increase production, or decrease cost of production, or add to the value of the mines. In this connection, it is to be noted that these expenditures were, in large part, for the identical articles of equipment dealt with in the Marsh Fork Case, namely, electric locomotives, mine cars, and steel rails, which expenditures the court held in that case were made "solely for the purpose of maintaining the capacity of the mine as the working faces of the coal recede," and that "they represent the cost, as it were, of bringing forward the working plant of the operator, which is made necessary as the coal is removed from the mine and the tunnels increase in length."

It is contended by the defendant in these cases that these expenditures ought to be capitalized because they have a life greater than one year. This contention is in direct contravention of the decision of the court in the Marsh Fork Case where that question is specifically treated.

After discussing the principles involved, the court said: "The fact that the trackage laid and the cars and locomotives installed may last for a number of years, is, we think, immaterial. However long they may last in the mine, they are but maintaining the mine's capacity, which would otherwise have been impaired by the lengthening of the tunnels due to the removal of the coal. While not repairs, they are in the nature of repairs, in that they are necessary to maintain the operation of the mine at the level of normal production."

Thus it seems clearly established that the nature of these articles of equipment, such as electric locomotives, mine cars, and steel rails, and the fact that they have a life longer than one year, is not material. It is not the nature of the article purchased, but the necessity for it, which is the determining factor.

Some things do not require proof; a mere statement is sufficient. It takes no evidence to prove that the mining of coal from a coal seam causes the "face" of the coal in the mine to "retreat." The length of the entry thereby increases. The increased length of the entry requires additional steel rail, locomotives, mine cars, copper wire for electric power, drainage, ventilation, and maintenance if the mine is to maintain its production, or even operate at all.

It is clearly established by the evidence in this case that the expenditures made, in question here, were necessary to maintain tonnage; second, that they were made for the purpose of maintaining production; third, that they were due to the increased length of the haul; and, fourth, that they increased the cost of production of coal in plaintiffs' mines.

The testimony further shows that the expenditures in question were necessary to maintain production; that they did not increase the normal production of the mines; and that they did not increase the productive capacity of the mines. Neither did they increase the value of the mines, for the reason that they added nothing to the value of the property and were only used to overcome certain conditions and to maintain the pre-desired output. These expenditures were necessary in order to maintain production; they increased the cost of production of coal, but did not increase the productive capacity of the mines; hence did not increase the value of the mines.

■ The defendant introduced evidence, particularly "Defendant's Exhibit Y-9," entitled "Stipulation," for the purpose of showing that the plaintiff is estopped from recovery in this case as to the years 1919, 1920, and 1921, because these claims were actually settled by that stipulation. I do not believe it was ever intended that the stipulation would change the position of the taxpayer from what it would have been had the case been actually tried by the Board of Tax Appeals.

"The rule is generally recognized that trial courts may, in the exercise of sound judicial discretion and in the furtherance of justice, relieve parties from stipulations which they have entered into in the course of judicial proceedings, and that on appeal the determination of the trial court will not ordinarily be interfered with, except where a manifest abuse of discretion is disclosed. Courts have frequently granted such relief in the case of stipulations which the parties have entered into improvidently, mistakenly, or as a result of fraudulent inducements, especially if the enforcement thereof would work injustice." 25 Ruling Case Law, 1099.

## Superior Pocahontas Coal Company.

As hereinbefore stated, under the heading "Winding Gulf Colliery Company Case," it is necessary to have in mind that the life of the coal mine is divided into three distinct periods; namely, the planning period, the developing period, and the operating period. The uncontradicted evidence in this case also shows that the Superior Pocahontas Coal Company was in the operating stage at the time the expenditures which constitute the basis for this litigation were made.

The uncontradicted evidence shows that the reason for the purchase of this equipment was to maintain normal production, and that its purchase was necessitated by the increase of the length of haul from the tipple to the working faces of the mine; that the articles purchased were placed in operation and continuously operated from the time of their purchase; that the purchase of the mine pumps was necessitated by flooded condition occurring in the mine due to the increase of excavated area; that the installation of the locomotive, the mine fans, the mine pumps, etc., herein referred to, increased the cost of production; that their effect on the amount of production was to maintain production and not to increase it; and that they did not add to the value of the mine as an operating entity.

The defendant filed certain "Requests" for finding of fact, and certain "Requests" for conclusions of law, which cannot be granted under the undisputed facts of this case.

Certain objections were made at the trial to the introduction of evidence and rulings thereon reserved. I do not deem it necessary to take the space to pass upon

each of these separately, but in reaching the determination of the facts I only considered evidence which I thought was properly admissible.

Recovery by the plaintiff Winding Gulf Colliery Company will be $27,865.85, the amount set forth in Plaintiff's Exhibit No. 20 for the years 1919, 1920, and 1926, with legal interest.

Recovery by the Superior Pocahontas Coal Company will be $4,088.45, with legal interest.

The usual paragraph exonerating the collector personally, in both of these cases, should be included in the orders.