## COMMISSIONER OF INTERNAL REVENUE v. H. E. HARMAN COAL CORP.

### No. 6398.

United States Court of Appeals
Fourth Circuit.

Argued June 17, 1952.

Decided Sept. 17, 1952.

George E. H. Goodner, Washington, D. C. (Dewey R. Roark, Jr., Washington, D. C., on brief), for respondent and cross-petitioner.

Melva M. Graney, Sp. Asst. to Atty. Gen. (Ellis N. Slack, Acting Asst. Atty.

Gen., and Lee A. Jackson, Sp. Asst. to Atty. Gen., on brief), for petitioner and cross-respondent.

Before PARKER, Chief Judge, and SOPER and DOBIE, Circuit Judges.

PARKER, Chief Judge.

These are cross petitions to review a decision of the Tax Court reported in 16 T. C. 781, where the facts are fully stated. Taxpayer is a coal mining corporation operating a mine at Harman, Virginia, and the case relates to income and excess profits taxes for the years 1944 and 1945. The questions presented by the petitions are (1) whether the cost of certain mining machinery was deductible as an ordinary and necessary business expense, (2) whether expenditures in building a slate chute were so deductible, (3) whether taxpayer was entitled to increased depreciation deduction because of increased operation of its mine, and (4) whether taxpayer sustained a deductible loss on the sale of its tipple tracks in 1945. The Tax Court decided the first question in favor of the taxpayer and the others in favor of the commissioner. We think that there was error only with respect to the decision of the first question.

On the first two questions, it appears that taxpayer in its returns for 1944 and 1945 charged to expense the following items:

*Purchased in 1944*

| | |
|---|---:|
| 2 Goodman shaker conveyors | $10,899.30 |
| 3 Joy loaders | 24,987.32 |
| Payments on slate chute in process of construction | 6,634.92 |
| Total | 42,521.54 |

*Purchased in 1945*

| | |
|---|---:|
| Balance of cost of slate chute completed | 13,823.98 |
| 8 Goodman short-wall cutting machines | 23,294.45 |
| 10 Conveyors | 15,490.08 |
| 1 Slabbing machine or arc-wall cutting machine | 7,139.00 |
| 50 Mine cars | 17,101.06 |
| 2 Electric mine jeeps | 2,040.00 |
| Total | 78,888.57 |

The commissioner disallowed the deduction of these items as expense but treated them as capital expenditures and allowed deduction of depreciation on account thereof of $7,280.36. The Tax Court found that the expenditures were made because of shortage of manpower, need of equipment suitable for mining thin seam coal and "the radical change in the natural condition of the coal seam in the sections of the mine in which operations were then being conducted".[1] The court found, also, that prior to 1944 the mine had been developed to full

---

1. The purpose of these expenditures was correctly set forth by the Tax Court in its findings of fact as follows:

"The conveyors were used in conjunction with the shortwall cutting machines by petitioner to mine a thin-seam of coal less than 39 inches high—which seam was first encountered in 1944 in a large area then being developed. Petitioner's regularly used equipment could not be utilized in seams less than 40 inches high, and petitioner's leases required that all mineable and merchantable coal be mined.

"The joy loaders were purchased because of a shortage of manpower and because of the increased number of widely separated sections being worked which made additional equipment necessary in order to avoid the uneconomic delay which would result from the moving of the equipment back and forth between working places a mile or so apart. Petitioner's actual experience with like Joy loaders purchased by it in 1939 and 1941

proved that the use thereof resulted in substantial savings in the production cost of units of coal produced with the aid of those machines as compared with hand loaded coal. The slabber machine, or arc-wall cutting machine, is used in conjunction with two Joy loading machines, and the machine purchased in 1945 was an additional machine needed because of the expansion of the mine.

"The conveyors, shortwall cutting machines, Joy loaders and arc-wall cutting machines, are in the active mining area at all times. They are used in close proximity to the working place in the mine, and are in use continuously. The cutting machines are used in the process of preparing the coal for the blasting operation. After the coal is shot down, the conveyors in the low seam area carry it out of the rooms to be loaded into mine cars for transportation to the tipple. The Joy loaders load the coal directly into the mine cars. As the working

capacity, that all of the mine equipment was purchased "to maintain production as the mine spread out and the working faces of the mine receded", that "none of the equipment replaced other machinery or added to the value of the mine" and that, despite the best efforts of taxpayer, the production of the mine had decreased and its overall cost of production per ton had increased every year since 1944. It held that the commissioner had properly treated the expenditures for the slate chute as capital expenditures on the ground that they constituted capital improvements but allowed the deduction of the cost of the equipment as ordinary and necessary business expense under Regulations III sec. 29.23 (m)–15(b).

▆ We think that the position of the commissioner should be sustained with respect to all the items involved, except the cost of so many of the mine cars as may be found to have been necessary because of the greater haul necessitated by the receding faces of the coal. It is admitted that all of the items had a life of more than one year; and ordinarily "items of plant equipment, etc., which have a useful life extend-

ing substantially beyond the year should be charged to a capital account and not to an expense account". Regulations III sec. 29.-41–3(2). The general rule, with the exception allowed in the case of mining equipment properly chargeable as current expense of coal mined, is set forth in Regulations III 29.23(m)–15(b), as follows:

"(b) Expenditures for plant and equipment and for replacements, not including expenditures for maintenance and for ordinary and necessary repairs, shall ordinarily be charged to capital account recoverable through depreciation. Expenditures for equipment (including its installation and housing) and for replacements thereof, which are necessary to maintain the normal output *solely because of the recession of the working faces of the mine,* and which (1) do not increase the value of the mine, or (2) do not decrease the cost of production of mineral units, or (3) do not represent an amount expended in restoring property or in making good the exhaustion thereof for which an allowance is or has been

---

face recedes, the cutting machines and loaders are moved with it. When a section is completely worked out, the machines are moved to a new section which has been previously prepared, but which may be some distance away. As the sections being worked spread out, more machinery, more locomotives, more cars, more of other equipment are needed. In so far as the cutting and loading machines (including conveyors) are concerned, it makes no difference how far the tipple is located from the working place in the mine. The distance between two working sections is determinative of the number of cutting and loading machines needed.

"Construction of the slate-bin, or slate-chute, was started in 1944 and was completed in 1945. It is a part of the tipple, and it enables petitioner to bring the slate and other mine refuse out of the mine with the regular coal trains, thereby eliminating the need for the storing thereof in mine cars, and makes such cars immediately available for the hauling of more slate or for more productive use. * * *.

"The mine jeeps acquired by petitioner in 1945 ran on the tracks in the mine and were powered by electricity taken by trol-

ley from the regular electric lines in the mines. These jeeps were used by petitioner's supervisory employees for the purpose of getting to the widely separated sections being worked without the delay of waiting for the regular coal trains to go to a particular location.

"The mine cars purchased in 1945 were needed because of extended hauls, the necessity for removing a greater amount of slate and other mine refuse caused by a change in the natural character of the seam being mined, as well as by the federal regulations with respect to slate removal, and the requirement of additional cars to serve each of the working places being worked in widely separate areas of the mine. * * *

"The conveyors which were purchased in 1945 were needed to operate with the shortwall cutting machines and were used in the same low vein of coal. It was practically impossible to employ miners to do hand work in a seam as thin as that encountered by petitioner in this area, and petitioner was required by its leases to mine all the mineable and merchantable coal. The slabber machine purchased in 1945 was another arc-wall cutting machine needed because of the expansion of the mine."

made, shall be deducted as ordinary and necessary business expenses." (Italics supplied.)

The reasoning underlying this regulation was expressed by this court in Marsh Fork Coal Co. v. Lucas, 4 Cir., 42 F.2d 83, 84, upon which it is said the regulation was based, in the following language:

"Ordinarily it is true that the purchase of machinery having a life greater than one year is to be charged to capital and not to expense for ordinarily such machinery is purchased either to increase production or to decrease cost and in either event to add to the value of the property. Expenditures such as those here involved, however, are not made either to increase production or to decrease cost of operation. They do not add to the value of the property, and are not made for that purpose. They are made solely for the purpose of maintaining the capacity of the mine as the working faces of the coal recede. They represent the cost, as it were, of bringing forward the working plant of the operator, which is made necessary as the coal is removed from the mine and the tunnels increase in length.

"It is possible, of course, to think of the increased trackage and the increased number of mine cars and locomotives made necessary by the lengthening tunnels as an increase of the capital investment in the mine; but the trouble is that this theory leads to the ridiculous result that, with the increase of investment, the property becomes less valuable, and that, when the investment is complete, the property is practically worthless. *It is much more reasonable, we think, to consider expenditures for trackage, cars, and locomotives to maintain normal output as being an expense necessitated by the removal of the coal which has lengthened the tunnels, and an expense which, in any fair system of accounting, should be charged against the coal so removed.*

"When an operator has removed sufficient coal to extend his tunnels so that he cannot maintain production with the equipment which he has, he must as a matter of course lay down more track and put in more cars and locomotives. The question is, Shall the expense thereby incurred be charged against the coal, the removal of which necessitated the expenditure to maintain normal operation, or against the coal yet unmined? *We think it is but fair to charge against the coal which has been mined the expense which its removal has necessitated.* We think, also, that this is the only practicable method of accounting. To capitalize the expenditures made to maintain normal output means that the cost of removal is pyramided against the coal farther back in the mine, with the result that the coal nearest the head house will appear to have been mined at abnormal profit and that farther back at a loss. (Italics supplied.)

It is clear that neither the language of the regulation nor the reasoning of the Marsh Fork case has application to the expenditures here involved. They have been necessitated not by the removal of the coal during the years in which they were made but by the thinness of one of the seams, the radical change in the nature of another and the shortage of available manpower. They were thus expenditures made in the interest of economy and efficiency and not "solely because of the recession of the working faces of the mine". They unquestionably added to what the value of the mine would have been without them and they decreased "the cost of production of mineral units" within the meaning of the regulation. We think that it is not only required by the regulation but by principles of sound accounting that they be capitalized and their cost spread over the years of their effective life rather than charged off as expense of a single year.

We do not think it determinative that the mine had been developed to full capacity prior to 1944 or that the equipment was purchased in an effort to maintain production. The thin seam of coal, the greater amount of slate and other refuse encountered as a result of the change in the char-

acter of the seam being mined and the increasing difficulty of obtaining manpower necessitated additional capital investment as additional mechanization was required for the proper working of the mine; and there is no reason why such investment should be charged against the coal mined during the current year instead of being amortized like other capital investments made in the interest of economy and efficiency.

■ Coming to the third question, that of increased depreciation, taxpayer had been claiming normal depreciation on the straight line basis over the estimated useful life of assets in terms of years. Prior to 1941 its operations had been on the basis of two shifts of 7 hours each. Beginning with 1941 it increased the hours of work and use of equipment in its mine and its claim is that this entitles it to an increased allowance for depreciation. It makes no additional claim for 1941 but asks increases of 33% for 1942, 50% for 1943 and 90% for 1944 and 1945. There is nothing in the evidence, however, to show that the effective life of the equipment was decreased as a result of this increased use. See Montgomery's Federal Taxes (1951–1952) vol. 1, pp. 914–916. There was evidence that it resulted in increased cost of repairs, but these were admittedly charged to ordinary and necessary expense of the business. While Taxpayer's president testified generally that the increased wear had shortened the life of the equipment, he admitted on cross examination that its over-all life would not be shortened and that it would last as long as taxpayer expected to use it. Under the circumstances, we think that the Tax Court properly denied the increased depreciation and we approve what the court said with regard thereto, as follows:

"This Court has held in a number of cases that if a taxpayer normally employs the straight line method of computing depreciation, as here, evidence of increased usage and other operating conditions do not warrant an allowance for abormal or accelerated depreciation absent a showing that the useful life of the depreciable asset was, in fact, thereby shortened. * * * Petitioner has failed to make this showing. It has shown in general terms that its mine was operated at an excessive pace and that proper maintenance for its equipment was not available. These two factors, however, do not prove that the remaining useful life of such equipment was necessarily shortened. To the contrary, there was no actual worthlessness or abandonment of the property, *nor is there evidence that any such eventuality was likely*. Assuming that there was an excessive amount of wear and tear, the indications were that this would be but temporary and petitioner so regarded it. We cannot appropriately find that the economic life of petitioner's equipment had been materially shortened or was in any danger of being exhausted." (Italics supplied.)

■ On the fourth question, the deduction of alleged loss resulting from the sale of tipple track, we think that the decision of the court was unquestionably correct. That track, which was essential to taxpayer's operations, had been built by it at a cost of $29,434.21, and depreciation had been taken on it in the sum of $7,796.63. The cost of maintaining this track rested on taxpayer and it received no benefit by way of freight reduction on account thereof. The track was sold to the Norfolk & Western Railway Company for a consideration of $1.00 upon an agreement that the railway company maintain it and taxpayer continue to have its use. In other words, as a result of the sale, taxpayer continued to enjoy the exclusive use of the track for its mine just as when the track belonged to it and was relieved of the cost of maintenance, which was assumed by the railway company. It is clear that instead of sustaining a loss taxpayer realized a benefit as the result of this transaction. We agree with what was said by the Tax Court in sustaining the commissioner's disallowance of the loss claimed, viz.:

"Consideration of the substance of the transaction here in question discloses petitioner's beneficial use of the tipple tracks was substantially the same

420

after the sale as it was before. The agreement of Norfolk & Western to permit the use of such tracks to petitioner without the burden of maintaining them, if anything, resulted in an improvement of petitioner's economic position. Actually, the sole effect of the transaction was the transfer of legal title to personal property which had no use other than to serve petitioner's mine. Petitioner has failed to show that its economic position has been in any way adversely affected as a result of this transaction. The record does not contain information which will enable us to place any evaluation upon the agreement of Norfolk & Western to maintain the tracks. Therefore, petitioner has not shown that the consideration received by it for the transfer of legal title to the tracks was less than its adjusted basis and that any loss was actually sustained by it."

Taxpayer argues that it is entitled to the deduction because its books show the disappearance of an asset upon which it was entitled to take depreciation during the ensuing years. The answer is obvious: entries in books should be made to conform to economic realities; economic realities cannot be ignored because of entries in books. Taxpayer has secured a valuable right in the nature of a lease of the tipple track for which it has exchanged the ownership of that property. This should be taken account of by proper entries and depreciation allowed under the rules applicable in such a situation.

The decision of the tax court will be affirmed except with respect to the items of equipment allowed as ordinary and necessary expense. As to these items it will be reversed and the cause will be remanded to the Tax Court with direction that none of them, with the exception of the amounts paid for mine cars, be allowed as ordinary and necessary expense of the business, and, as to the mine cars, that only the purchase price of those the purchase of which was made necessary by the recession of the working faces of the mine be allowed as ordinary and necessary expense, with no such allowance for those whose purchase was necessitated by the greater productivity of the mechanized equipment.

Affirmed in part, reversed in part and remanded with directions.