*Decision will be entered under Rule 50.*

THE ROUNDUP COAL MINING COMPANY, A CORPORATION, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 36709. Promulgated May 21, 1953.

*Edgar M. Morsman, Esq.*, and *Truman W. Morsman, Esq.*, for the petitioner.

*Marvin E. Hagen, Esq.*, for the respondent.

OPINION.

WITHEY, *Judge:* The first two issues are whether the petitioner may deduct from gross income as ordinary and necessary expenses the cost of constructing an air shaft and the cost of a fan and compressor placed on top of the air shaft. The record shows that from 1908 to 1920 air was blown into petitioner's mine by a fan placed at the mine entrance. In 1920 the mine had been driven under the Musselshell River. During that year another air shaft was constructed just across the river. An exhaust fan was installed atop this shaft. Air was blown in from the mine entrance and drawn out through the 1920 air shaft. With the recession of the working faces of the mine, there developed a shortage of air and it became necessary to provide ventilation at a point nearer the working faces. In 1928 a new air shaft was built and the blower fan theretofore installed at the mine entrance was moved to this point. By 1943 operations were 3½ miles from the mine entrance and air was being blown through worked-out areas with only a minimum of the ventilating current reaching the working sections. Because of the shortage of air, petitioner constructed another air shaft in 1944 at a cost of $66,316. Petitioner left in place the blower fan that was operating at the 1928

air shaft for use in emergency. It was merely turned off, although still in working order. Its capacity was not sufficient to provide adequate ventilation at the receded working faces, but it was an integral part of the ventilating system of the mine. Petitioner purchased a new blower fan and compressor in 1944 for $4,701.55 and placed it atop the new 1944 air shaft. Respondent has disallowed as deductions the expenditures for the 1944 shaft, fan, and compressor on the ground that they constituted capital expenditures.

Respondent contends that the expenditure for the 1944 air shaft must be considered a major capital item of improvement which enhanced the value of the mine and cannot be considered a minor item of equipment used solely for the purpose of maintaining normal production. As to the fan and compressor, respondent contends they were major capital improvements subject to exhaustion, wear, and tear, and had a useful life of not less than 20 years. We do not agree with respondent's contention.

Generally speaking, expenditures for plant, equipment, etc., having a useful life beyond a year should be capitalized. Regs. 111, sec. 29.41-3 (a). In the case of mining equipment, an exception is provided by Regulations 111, section 29.23 (m)-15 (a) and (b):

Expenditures * * * necessary to maintain the normal output solely because of the recession of the working faces of the mine, and which (1) do not increase the value of the mine, or (2) do not decrease the cost of production of mineral units, or (3) do not represent an amount expended in restoring property or in making good the exhaustion thereof for which an allowance is or has been made, shall be deducted as ordinary and necessary business expenses.

See *Marsh Fork Coal Co.* v. *Lucas*, 42 F. 2d 83; *United States* v. *Roden Coal Co.*, 39 F. 2d 425. Respondent now, as he has so persistently in the past, seeks to add another condition which must be met before taxpayer may be permitted to expense the cost of facilities "necessary to maintain the normal output" of a mine. That condition is that the taxpayer must show the expenditure to have been *minor* rather than *major*. We find no authority for his contention. The terms are entirely relative and indeterminable. We must decide this issue upon the basis of Regulations 111, section 29.23 (m)-15 (a) and (b), because that regulation sets forth the only recognized pattern upon which to base decision.

In the cases last above cited and in *Winding Gulf Colliery Co.* v. *Brast*, 13 F. Supp. 743, affd. 94 F. 2d 179, it was, in effect, established that if no decrease in the cost of production resulted from an expenditure and no portion thereof was used in the restoration or making good the exhaustion of property, no increase in value of a mine occurred within the meaning of section 24 (a) (2). If in addition to the foregoing it is shown that an expenditure is brought about because

of the recession of the mine working faces the amount so expended may be expensed.

Ventilation and escape shafts such as those here involved are not movable and therefore may not like trackage be brought or extended to working faces. Indeed, it was necessary in petitioner's mine to keep operable sufficient of such shafts to provide emergency ventilation and escapeways. The necessity could have arisen only through recession of the working faces. Air and escapeways are as necessary to maintain the output of petitioner's mine as trackage and locomotives. The particular shaft here involved was necessary in order to operate the mine at all, for it is apparent that it provided the only means of escape should cave-ins result in the sump area which was between the shaft and the mine opening. There is an analogy between the shaft and trackage. Both are part of a system which must be enlarged and extended as the working faces recede. While the shaft alone might serve as an escapeway it could not alone serve as a complete answer to petitioner's ventilation problem. Air might be drawn into the mine through the shaft or it might serve as an exhaust, but in either event other ventilating facilities must of necessity take over the opposite function. The whole mine had to be ventilated, not just the working faces. This shaft is as properly considered a part of a system of ventilation as is a section of trackage a part of the mine railway system.

We are satisfied that the fan and compressor here involved are also properly to be treated as expense items. There is no real difference between the category of the fan and compressor and that of the locomotive in *Marsh Fork Coal Co., supra.* The utility of both depends upon a conduit, in one case the shaft and in the other trackage. Both perform a function at the mine faces and each furnishes the motive power to operate a system, one being a ventilation system and the other a railway system.

The case of *Commissioner* v. *H. E. Harman Coal Corporation,* 200 F. 2d 415, is distinguishable as in that case the expenditures were "in the interest of economy and efficiency and not 'solely because of the recession of the working faces of the mine.' "

We can see no essential difference between expenditures made for the addition of track, or mine cars and wheels, or water pipes, or locomotives, or switches, to maintain production, which were allowed in *United States* v. *Roden Coal Co., supra; Marsh Fork Coal Co.* v. *Lucas, supra;* and *Commissioner* v. *Brier Hill Collieries,* 50 F. 2d 777, and the expenditures here made for an air shaft, fan, and compressor.

The expenditures for the 1944 shaft, compressor, and fan must be allowed as deductions as ordinary and necessary expenses necessary for the maintenance of production.

The third issue for determination is whether expenditures of $81,000 in 1945 and $13,411.12 in 1946 made by petitioner in constructing a rock slope are deductible in the years made or whether they should have been capitalized.

Petitioner contends that the rock slope was necessary to provide ventilation for the miners, that it was constructed for the purpose of providing an escapeway in case of a mine disaster, and that it was necessary to maintain normal production. Petitioner cites *West Virginia-Pittsburgh Coal Co.*, 24 B. T. A. 234; *United States* v. *Roden Coal Co., supra; Marsh Fork Coal Co.* v. *Lucas, supra;* and *Commissioner* v. *Brier Hill Collieries, supra,* as sustaining its contention. These cases are distinguishable as the expenditures there involved were made to maintain normal production, while in the instant case it is clear the expenditure for the construction of the slope had no bearing upon petitioner's production during the tax years at issue.

Petitioner had constructed in 1944 the aforementioned air shaft for ventilating purposes and also installed steps in the shaft which could be used as an escapeway. These two items helped to maintain normal production. The rock slope was about 3,500 feet from the working faces in 1945 and 1946 and was not connected to the working faces until 1950. It had been driven in new and undeveloped territory beyond the then existing mine workings. We cannot see any relation between the maintaining of production in 1945 and 1946 and the construction of the rock slope. Cf. *New Pittsburgh Coal Co.* v. *United States*, 200 F. 2d 146. It is our opinion that this expenditure was in the nature of a development expense.

The expenditure was for future production and should be capitalized.

The fourth issue to be considered is whether petitioner is entitled to accelerated depreciation on a Joy loader purchased on January 1, 1942, for $13,029.60 and another on January 1, 1946, for $11,062.49. On its income tax returns for the years 1943 through 1946, inclusive, petitioner computed depreciation on the straight line basis on an estimated useful life of 7 years. Respondent allowed depreciation based on an estimated useful life of 17 years and disallowed depreciation deducted on a shorter life. Petitioner does not argue this issue in its brief, but there is testimony to the effect that it operated on a double shift. Apparently its position is based on its increase in operating hours which necessarily required using the loaders twice as much, thus justifying accelerated depreciation. This same issue was before this Court recently in *H. E. Harman Coal Corporation*, 16 T. C. 787, affirmed on this point, 200 F. 2d 415. There the Court stated that in addition to showing extra usage of the equipment the petitioner must show that such extra usage did actually reduce the estimated useful life of the equipment. Petitioner has not met this requirement. See

also *Copifyer Lithograph Corporation*, 12 T. C. 728; *Harry Sherin*, 13 T. C. 221.

Respondent's action is sustained.

The fifth issue involves the deduction of $763.83 as accrued premium on catastrophe insurance. On April 19, 1943, petitioner purchased catastrophe insurance from Lloyd's of London at a cost of 20 cents per $100 of payroll, subject to annual audit, and deposited a premium of $600 on April 28, 1943. The cost of the premium based on the actual payroll from April 19, 1943, to December 31, 1943, was $763.83. Petitioner was on the accrual basis of accounting.

Respondent's deficiency notice stated:

Deduction claimed for the year 1943 for catastrophe insurance in the amount of $763.83 has been disallowed on grounds that such amount represents a contingent expense which is not allowable as an ordinary and necessary business expense under Section 23 (a) (1) (A) of the Internal Revenue Code.

We do not think respondent was correct in disallowing the deduction.

Taxpayers using the accrual basis of accounting are allowed to deduct expenses as they are incurred. *Charles Weisbecker*, 18 B. T. A. 766. The only contingent factor with respect to the accrual of the insurance premiums is the fact that the payroll had to be audited annually. We do not think this prevents the deduction of the premiums, as it has been held that when a liability has accrued during the year it may be the basis for a deduction, although the amount of the liability has not been definitely ascertained. *United States* v. *Anderson*, 269 U. S. 422; *Brown* v. *Helvering*, 291 U. S. 193.

This record does not indicate a contingent liability with respect to the insurance premiums as petitioner was on the accrual basis and had entered into a contract which by its terms established liability for the insurance premiums. Petitioner's liability became fixed as the payroll was built up. The extent of its liability was not contingent but was determinable by simple computation at the close of any tax year.

Petitioner is entitled to deduct the accrued insurance premium of $763.83 on its catastrophe insurance policy.

The last issue involves the computation of percentage depletion. Petitioner reported on its 1943 income tax return gross income from coal sales in the amount of $970,808.23 for computing the depletion deduction. That sum included the amount of $2,031.64 which represented the sales price of coal mined by petitioner and used as powerhouse fuel. In computing gross profit from sales, the petitioner deducted the amount of $2,031.64 as a cost of operation and also deducted as depletion 5 per cent of the $2,031.64. Respondent in determining the deficiency did not change the deduction of $2,031.64 taken as a cost of operation but disallowed $101.58 of the deduction taken for depletion.

Petitioner does not present any argument in its brief on this issue. The testimony was that it priced the coal used in its powerhouse at sales price. We can only assume petitioner contends that since it included the selling price of the coal it used in gross income from the property,[1] it should be allowed depletion on the entire amount. We do not agree with the petitioner.

Petitioner's gross income included an amount on which he realized no income. He made no sale and received no income as such. This was merely a bookkeeping entry, at best, as petitioner could not realize any income on a sale to itself. The Supreme Court said in *Helvering v. Mountain Producers Corp.*, 303 U. S. 376:

The term "gross income from the property" means gross income from the oil and gas (Helvering v. Twin Bell Syndicate, supra) and the term should be taken in its natural sense. * * * We do not think that we are at liberty to construct a theoretical gross income by recourse to the expenses of production operations. * * *

Petitioner increased its gross sales by the cost of the coal it used and at the same time decreased the gross profit on sales by including this same amount as a cost of operation. This resulted in no profit or loss to petitioner as far as its income was concerned.

Petitioner realized no gross income from property within the meaning of section 114 (b) (4) (B). Respondent's disallowance will be sustained.

Reviewed by the Court.

*Decision will be entered under Rule 50.*

---

[1] SEC. 114. BASIS FOR DEPRECIATION AND DEPLETION.

(b) BASIS FOR DEPLETION.—

* * * * * * *

(4) PERCENTAGE DEPLETION FOR COAL * * *.—

* * * * * * *

(B) Definition of Gross Income From Property.—As used in this paragraph the term "gross income from the property" means the gross income from mining. The term "mining," as used herein, shall be considered to include not merely the extraction of the ores or minerals from the ground but also the ordinary treatment processes normally applied by mine owners or operators in order to obtain the commercially marketable mineral product or products. The term "ordinary treatment processes," as used herein, shall include the following: (i) In the case of coal—cleaning, breaking, sizing, and loading for shipment; * * *. The principles of this subparagraph shall also be applicable in determining gross income attributable to mining for the purposes of sections 731 and 735.