TENNESSEE CONSOLIDATED COAL COMPANY, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 33383. Promulgated October 20, 1931.

*George E. H. Goodner, Esq.*, for the petitioner.
*F. B. Schlosser, Esq.*, for the respondent.

**372**

OPINION.

SEAWELL: The first error assigned is that, " In computing taxable net income for 1920, the Commissioner has erroneously disallowed a loss of $52,312.06 sustained by petitioner upon the abandonment of its coke ovens in that year." We are unable to agree that the facts presented justify the deduction. The ovens in question were originally constructed in and about 1883 and were operated by the predecessor owner until 1903, when a strike occurred which kept them idle until acquisition by the petitioner in 1905. They were likewise not operated from date of acquisition by petitioner until 1917, when, apparently due to the great demand for coke, the petitioner leased them to the Sewanee Fuel & Iron Company, which operated them during 1917, 1918 and 1919, discontinuing operations in the latter part of 1919. The petitioner then attempted operations in 1920, but before the end of the year found it unprofitable and ceased operations. They were not thereafter operated except for a short period in 1922 when, as an incident to a proposed sale of petitioner's properties, they were fired for the purpose of demonstrating that petitioner's coal would

produce coke. In the meantime, in 1913, a new type oven, known as the "by-product," came into existence, which, because of certain advantageous features, made it very difficult by 1920 for the "beehive" oven (type here in question) to operate in competition therewith, and by 1931 had almost entirely superseded the latter type. The railroad leading to the ovens was spiked down in 1927 and taken up in 1930.

On the foregoing facts we are unable to agree that abandonment of the ovens in 1920 has been substantiated. Aside from the facts set out in our findings, further testimony was offered by petitioner's president as follows:

Q. Did you reach any determination as to these coke ovens at the end of 1920?
A. We reached the conclusion we could not operate them at a profit and therefore decided to abandon them.
Q. And did you let the fires go out and abandon them?
A. We did.

When the same witness was asked why the petitioner had not operated the ovens prior to 1920, he replied that "we never thought we could operate those ovens at a profit." Of course, a different situation existed in 1905 from that in 1920 due to the perfection of a new type of coke oven, but the mere fact that the ovens were found unprofitable and therefore were withdrawn from operation is not conclusive that they were not held with the intention of future use, should a favorable occasion arise. We have no evidence of corporate action tending to show abandonment other than shown above; in fact, in the balance sheets accompanying the returns for 1920 and 1922 the ovens are still carried as an asset at a value of $18,000, and apparently no deduction was claimed in the 1920 return on account of such abandonment. The first overt acts tending to show physical abandonment occurred in 1927 when the railroad leading to the ovens was spiked down and in 1930 when the rails were removed, and as late as 1922 they were still in an operating condition.

On the whole, we are not satisfied that abandonment has been shown in 1920, but even if so shown, we could not allow the loss claimed, for the reason that we have no evidence as to their value on March 1, 1913. At that time they had been idle for ten years when the petitioner was of the opinion that they could not be profitably operated. In its return for 1914 the petitioner offered the following explanation for a depreciation rate of 10 per cent claimed on "Coke Ovens & Equipment": "Equipment rotted and ovens not in use." Further, it was in 1913 that the "by-product" oven which was later to replace the "beehive" oven made its appearance. Under such circumstances, we certainly are not justified in accepting cost in 1905, even after allowing for depreciation to March 1, 1913, as the same as fair market value at March 1, 1913. It is our understanding that the loss allowable, if any, under the circumstances here presented, would be based on the lesser of two amounts, namely, cost or

fair market value on March 1, 1913, after proper allowance for depreciation. *Jackson County State Bank*, 2 B. T. A. 1100, and *Birmingham Machine & Foundry Co.*, 22 B. T. A. 483. Since we have no evidence as to the March 1, 1913, value, we are in no position to sustain the claim for deductible loss.

In the next place, it is contended by the petitioner that the Commissioner has erroneously understated invested capital in the amount of $52,312.06, representing the depreciated cost of coke ovens on December 31, 1919. The facts which give rise to this issue are that in the adjustment of the returns prior to 1920 the Commissioner determined a rate of depreciation on the coke ovens of 7 per cent, that is, an approximate life of 14 years, and since the ovens were acquired in 1905, they were considered as fully depreciated by the beginning of 1920, and therefore no credit was allowed on account thereof in determining invested capital for 1920. The contention of the petitioner is that the rate used by the Commissioner is excessive and in lieu thereof a rate of 2 per cent should be used. In support of this position, testimony was offered to the effect that, aside from the linings, the ovens would last almost indefinitely with proper repairs, but that under the terms by which petitioner obtained them they would revert to the predecessor owner at the end of 50 years unless sooner removed from the premises, and therefore a rate of 2 per cent is proper. When a rate of 2 per cent is used the residual value shown in the error assigned remains.

We, however, are not convinced that the facts presented substantiate the petitioner's contention. The statement that a given asset can be made to last indefinitely with proper repairs means little without a full showing as to what repairs were made and how they were taken care of. Apparently, the total cost of some $73,000 in 1905 included oven linings and we are shown nothing as to whether they were ever replaced or repaired other than that they constituted about the only item which would ordinarily need repair. It was further shown that when the ovens were leased to the Sewanee Fuel & Iron Company in 1917, after they had been idle for 14 years, the lessee was required to bear the cost of placing them in an operating condition, but what repairs were necessary or were made is not shown. Some contradiction appears in the testimony as to depreciation suffered while ovens are not in use. The petitioner's president testified that when not in use and without any repairs or upkeep the weather would have no effect on the ovens and that brush and small trees would not grow in the walls and cause them to separate. The testimony of the Commissioner's witness was to the contrary and this was further substantiated by his statement of what had occurred in the case of these ovens after they had been idle from 1920 to 1931. We think the latter view more reasonable.

The evidence is also confusing and unsatisfactory as to the depreciation previously claimed by the petitioner. Its treasurer, who testified that he was familiar with its books and records and the various issues which had arisen with the Department since 1912, was unable to furnish, on cross-examination, any information as to the depreciation claimed prior to 1920 or the value at which the ovens were carried on the books at the beginning of 1920, though on direct examination he was able to state that 7 per cent was used by the Commissioner for all years prior to 1920 and that his action resulted in the entire elimination of the ovens from the capital account for invested capital purposes. The petitioner further insists that the returns which were submitted in evidence from 1914 to 1920 do not show an attitude inconsistent with their present position. We are not convinced that this is true. As heretofore stated in connection with another issue, the return for 1914 shows a rate of 10 per cent claimed on " Coke Ovens & Equipment," with the explanation, " Equipment rotted and ovens not in use." The petitioner insists that since both ovens and equipment were included, it does not show anything as to depreciation claimed on ovens alone, though the amount claimed, $8,000, is well in excess of 10 per cent of the agreed cost of ovens of some $73,000. In a letter written to the Collector of Internal Revenue at Nashville, Tenn., in 1914, the petitioner's president stated that it (petitioner) had more than 300 coke ovens " which had been lying idle for several years and for this reason they are depreciating even more than we have been taking credit for." Of course, we do not know what depreciation was theretofore being taken, but such a statement is hardly consistent with his present testimony to the effect that the elements have no effect on idle coke ovens and that their life is almost indefinite. Other reasons for our conclusion could be given, though we regard it sufficient to say that on the whole record as presented we are not convinced that the rate of 2 per cent claimed by the petitioner is substantiated.

On the other hand, we are of the opinion that the Commissioner was not justified in the entire elimination of the coke ovens from the asset account as at the end of 1919. While we know little of their condition prior to 1917, we do know that in 1917 they were leased to a company which placed them in operating condition and continued to operate them until the latter part of 1919. The petitioner itself operated them during 1920 and they were still in an operating condition as late as 1922. The first dismantling acts connected with the ovens seem to have occurred in 1927 and 1930. Obsolescence was, of course, an important factor by 1920, due to the perfection of an improved type of oven, but the old type was still being used by one or two operators in petitioner's district as late as 1931 and we are not convinced that petitioner's ovens were obsolete in 1920. They were

shown in the balance sheet which accompanied the return for 1919 at a value of $18,000 as of December 31, 1919, and we are of the opinion that cost of at least that amount remained unextinguished at that date and that accordingly that amount should be allowed in determining invested capital for 1920.

The final issue relates to the deductibility of the expenditures for mine equipment set out in our findings. We are unable to distinguish the character of these items from those involved in *West Virginia-Pittsburgh Coal Co.*, 24 B. T. A. 234, wherein deductions on account thereof were allowed, and accordingly the petitioner's contention on this point is sustained.

*Judgment will be entered under Rule 50.*