**UNITED STATES GYPSUM COMPANY**

**v.**

**UNITED STATES of America.**

**Nos. 58 C 1811, 59 C 1487.**

United States District Court
N. D. Illinois.

March 6, 1962.

James T. Otis, Robert M. Gunn, Mac-Leish, Spray, Price & Underwood, Chicago, Ill., for plaintiff.

James P. O'Brien, U. S. Atty., Chicago, Ill., and Louis F. Oberdorfer, Asst. Atty. Gen., Edward S. Smith, Atty., Dept. of Justice, Jerome Fink, Atty., Dept. of Justice, Ronald Meteiver, Atty., Dept. of Justice, Washington, D. C., for defendant.

JULIUS J. HOFFMAN, District Judge.

The plaintiff, United States Gypsum Company, seeks a refund from the defendant, United States of America, of a portion of the federal income taxes, together with interest thereon, which it paid for the years 1952 and 1953. The plaintiff filed two actions in this court, concerning its claims for refunds for 1952 and 1953, respectively. The actions were consolidated for trial.

The court has jurisdiction over this cause pursuant to 28 U.S.C. § 1346(a) (1). The plaintiff has filed proper claims for refunds of the taxes here involved with the Commissioner of Internal Revenue. These claims have been pending before the Commissioner for more than six months, and no action has been taken with respect to the allowance of the claims here in controversy. The plaintiff, therefore, has met the requirements of 26 U.S.C. § 3772(a) (1) & (2).

I. STIPULATIONS AND OTHER AGREEMENTS REACHED BY THE PARTIES.

In the course of the proceedings before this court, the parties have reached agreement concerning certain claims of the plaintiff, as follows:

(1) The parties stipulated, prior to trial, that the plaintiff has withdrawn a claim for a deduction as a current expense of the cost of a Euclid truck purchased in 1952 for $24,551. This claim was included in error in the complaint in case number 58 C 1811.

(2) The parties stipulated in the course of the trial that the plaintiff has received a refund from the Commission-er of Internal Revenue in the amount of $495,366.46, in settlement of the plaintiff's claim in case number 58 C 1811 that it was entitled to a depletion deduction for the year 1952 equal to five per cent of the gross income from its mines and quarries, under section 114(b) (4) (A) (i) of the Internal Revenue Code of 1939, 26 U.S.C. § 114(b) (4) (A) (i). That claim, therefore, is no longer at issue in this case.

(3) The parties stipulated at the outset of the trial that the plaintiff has withdrawn its claim for a depletion deduction on its limestone quarry at Farnums, Massachusetts, at the rate of fifteen per cent, as chemical grade limestone, instead of at the rate of ten per cent, as calcium carbonate.

(4) The parties further stipulated before trial that the plaintiff is entitled to a reduction of its taxable income for the year 1953 in the amount of $517.61, which represents the excess which the plaintiff received over the purchase price on the sale of certain treasury stock. The defendant specified that it agreed to the plaintiff's right to this deduction for purposes of this action, only.

(5) The parties further stipulated before trial that the plaintiff is entitled to a deduction from gross income of $1,387.29, for certain state taxes paid by the plaintiff based upon income applicable to the year 1953. The defendant specified that it agreed to the plaintiff's right to this deduction for purposes of this action, only.

(6) Subsequent to the trial, the defendant agreed that the plaintiff is entitled to a depletion deduction from gross income, under section 114(b) (4) (A) (i) of the Internal Revenue Code of 1939, for the year 1953, equal to five per cent of the gross income from the thirteen gypsum mines and quarries which the plaintiff operated during that year. In United States Gypsum Co. v. United States, 253 F.2d 738 (7th Cir. 1958), the Court of Appeals for the Seventh Circuit affirmed a ruling of the District Court for the Northern District of Illinois that

these same thirteen mines or quarries of the plaintiff were entitled to a five per cent depletion deduction under section 114(b) (4) (A) (i) for the year 1951.

The uncontroverted evidence of the plaintiff at the trial established that during the tax year ended December 31, 1953, the plaintiff was engaged in the mining of these thirteen natural mineral deposits of gypsum, and the gypsum extracted from these mines during 1953 was of the same quality and nature as that extracted from its mines in 1951 and 1952. During 1953, the plaintiff mined a total of 4,267,183 tons of gypsum rock, resulting in gross income from mining of not less than $13,385,575, on account of which the plaintiff realized net income from mining of $4,595,015. For the tax year ended December 31, 1953, the plaintiff claimed, and the Commissioner of Internal Revenue failed to allow, a deduction of $622,100 under section 23(m) of the Internal Revenue Code of 1939, 26 U.S.C. § 23(m), as amended, pursuant to the percentage depletion allowance provision of section 114(b) (4) (A) (i).

On the basis of the plaintiff's evidence, and under the authority of United States Gypsum Co. v. United States, supra, the plaintiff's gypsum is "stone" within the meaning of the percentage depletion allowance provisions of section 114(b) (4) (A) (i) of the Internal Revenue Code of 1939; that this provision is applicable to the computation of the plaintiff's federal income tax liability for the tax year ended December 31, 1953; and that the plaintiff should have been permitted to deduct from gross income, on account of percentage depletion allowance, $622,100 under section 23(m) of the Internal Revenue Code of 1939.

(7) Subsequent to the trial, the defendant agreed that the plaintiff is entitled to a deduction from gross income of $20,244 for the year 1952 for the purchase of a fifteen ton truck for its mine at Southard, Oklahoma.

Testimony of the plaintiff's witness Appleyard established that the recession of the working faces in the lower strata of the deposit at the Southard mine had increased the haulage distance between those working faces and the plaintiff's main plant, and the purchase of an additional truck was required to maintain the normal rate of output from this strata, despite the increased haulage distance from the working faces to the crushing plant. This expenditure was necessitated solely because of the recession of the working faces of the mine, and did not increase the value of the mine, decrease the cost of production of mineral units, or represent an amount expended in restoring property or in making good the exhaustion thereof for which an allowance is or has been made. Consequently, this expenditure qualifies as an ordinary and necessary business expense under section 39.23(m)–15 of Treasury Regulations 118, under the Internal Revenue Act of 1939.

II. ITEMS IN CONTROVERSY CLAIMED AS RECEDING FACE EXPENDITURES BY THE PLAINTIFF.

The claims of the plaintiff that remain in issue concern expenditures for equipment for various of the plaintiff's mines and quarries. The plaintiff asserts that these expenditures qualify as ordinary and necessary business expenses under Treasury Regulations 118, section 39.23 (m)–15 (Internal Revenue Code of 1939). The defendant, on the other hand, contends that they fail to qualify as receding face expenses.

The applicable Treasury Regulation provides as follows:

"Sec. 39.23(m)–15. (As amended by T.D. 6096, 1954–2 Cum.Bul. 69.) *Allowable Capital Additions in Case of Mines.*—(a) *General Rule.*—Expenditures for plant and equipment and for replacements, not including expenditures for maintenance and for ordinary and necessary repairs, shall ordinarily be charged to capital account recoverable through depreciation. Expenditures for equipment (including its installation and

housing) and for replacements thereof, which are necessary to maintain the normal output solely because of the recession of the working faces of the mine, and which (1) do not increase the value of the mine, or (2) do not decrease the cost of production of mineral units, or (3) do not represent an amount expended in restoring property or in making good the exhaustion thereof for which an allowance is or has been made, shall be deducted as ordinary and necessary business expenses."

It is useful to consider this regulation against the background of the relevant provisions of the Internal Revenue Code of 1939.

Section 23(a) (1) thereof provides that in computing net income there shall be allowed as deductions "All the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business * * *." Section 24(a), 26 U.S.C. § 24(a) provides that in computing net income no deduction shall be allowed in respect of "(2) Any amount paid out for new buildings or for permanent improvements or betterments made to increase the value of any property or estate except expenditures for the development of mines or deposits deductible under section 23 (cc); (3) Any amount expended in restoring property or in making good the exhaustion thereof for which an allowance is or has been made * * *."

Section 23(cc), added to the Code by the Revenue Act of 1951, 65 Stat. 452, 26 U.S.C. § 23(cc), allows as deductions "(1) * * * all expenditures paid or incurred during the taxable year for the development of a mine or other natural deposit (other than an oil or gas well) if paid or incurred after December 31, 1950, and after the existence of ores or minerals in commercially marketable quantities has been disclosed." The section, however, specifies that it "shall not apply to expenditures for the acquisition of or improvement of property of a character which is subject to the allowance for depreciation provided in section 23 (l), but allowances for depreciation shall be considered, for the purposes of this subsection, as expenditures." Subsection (2) of this provision permits the taxpayer to elect to treat development expenditures as deferred operating expenses, deducted ratably as the units of produced mineral benefited by the expenditures are sold. Section 23(l), referred to in section 23(cc) (1), provides for "A reasonable allowance for the exhaustion, wear and tear (including a reasonable allowance for obsolescence)—(1) of property used in the trade or business, or (2) of property held for the production of income."

■■ These various provisions, read together, show a certain pattern in the treatment of depreciable mining property. Ordinary and necessary expenses of a business are deductible as current expenses, but buildings or improvements made to increase the value of any property are not deductible. Mine development expenditures are deductible, but this provision expressly excludes depreciable property. However, section 39.23 (m)–15, Treasury Regulations 118, quoted previously, allows a deduction as an ordinary and necessary business expense for expenditures for equipment, and for replacements thereof, necessary to maintain the normal output of a mine solely because of the recession of the working faces of the mine, and which do not increase the value of the mine, or do not decrease the cost of production of mineral units, or do not represent an amount expended in restoring property or in making good the exhaustion thereof for which an allowance is or has been made.

It should be noted that prior to 1951 mine development costs incurred prior to the production stage of the mine were not deductible as ordinary and necessary business expenses. Section 29.23(m)–15 of Treasury Regulations 111, applicable to years prior to 1951, provides that "(a) All expenditures in excess of net receipts from minerals sold shall be charged to capital account recoverable through

depletion while the mine is in the development stage." After the production stage of the mine was reached, development expenditures, made to maintain the output of the mine, were deductible as operating costs. Clear Fork Coal Co. v. Commissioner, 229 F.2d 638 (6th Cir. 1956), reversing 22 T.C. 1075 (1954). Such expenditures were generally treated as deferred costs, deductible in the years in which the ore benefited by the expenditures were produced and sold. See G.C.M. 13954, XIII–2 Cum.Bul. 66, 72 (1934); Alexander & Grant, "Mine Development and Exploration Expenditures," 8 Tax L.Rev. 401, 414 (1952–53); Carson, "Tax Problems of the Mining Industry," Proceedings of New York University Ninth Annual Institute on Federal Taxation 319, 335 (1951). Since 1951, development costs incurred both before and after the production stage is reached have been deductible as expenses. § 39.23(cc)–1, Treasury Regulations 118.

Provisions relating to development are described above in order to show the general legislative treatment with respect to mine expenditures. On the one hand, mine development, both before and after the production stage, is given special, liberal treatment by the Revenue Act of 1951. On the other hand, depreciable mine property has received special treatment as deductible expenses only under the specific conditions set forth in section 39.23(m)–15 of Treasury Regulations 118, originally promulgated in art. 242(b) of Regulations 77 (1933 ed.) under the Revenue Act of 1932. Congress has not seen fit to change these conditions in the course of liberalizing the treatment of development expenditures, and we may consider that it has approved the case law and regulations bearing upon expenditures for depreciable property in mining.

The evidence concerning the expenditures in question was presented by the plaintiff's witness Appleyard, its manager of mines. Appleyard has been in the plaintiff's employ for twenty years and is a mining engineer of considerable experience. One of his duties as manager of mines for the plaintiff is to make the final decisions on expenditures for equipment with regard to recession of mine faces.

The defendant introduced no evidence, insisting that the plaintiff has failed to establish a prima facie case for recovery.

*Plasterco, Virginia Mine*

1. 1953 expenditure for construction of a new ore pocket: $118,130.
2. 1953 expenditure for a new hoist motor and skips: $59,801.

During the tax year 1953, the plaintiff owned and operated a gypsum mine at Plasterco, Virginia, and during 1953, the plaintiff expended $118,130 for the construction of a new ore pocket and $59,801 for a new hoist motor and skips at the Plasterco mine.

The Plasterco mine is an underground mine having a main vertical shaft and horizontal tunnels which extend out from the main shaft at various levels. In 1952–53, the main shaft was extended downward from the sixth level to what is now the ninth level, because the gypsum mined at the upper levels was nearing depletion.

In order to mine at the new levels, it was necessary to excavate a new ore pocket at the ninth level. An older ore pocket, located just below the sixth level, could not serve the mining at the levels below. The ore pocket is used to hold the gypsum mined from the working faces. The gysum is transferred from the ore pocket to skips and hoisted to the surface.

The new ore pocket at the ninth level was two hundred feet below the location of the old pocket; consequently, to compensate for the time lost in hoisting from the lower level, it was necessary to install a faster, larger motor on the hoist and to redesign the skips to move up and down faster and dump faster at the top.

These expenditures for a new ore pocket, hoist motor, and skips were necessary to maintain the normal output of the mine solely because of the reces-

sion of the working faces of the mine, and did not increase the value of the mine, decrease the cost of production of mineral units, or represent an amount expended in restoring property or in making good the exhaustion thereof. The expenditures merely permitted the plaintiff to maintain the original designed output of the mine, even though it was mining at lower levels. They therefore qualify as deductions under the treasury regulations set forth above.

The defendant contends that these expenditures fail to qualify as receding face deductions for two reasons: (1) They were not necessitated because of the recession of the working faces of the mine, but rather because the mining was proceeding into a "new area." The defendant maintains that expenditures for the mining of "new areas" cannot qualify under the regulation. (2) The plaintiff has failed to establish a prima facie case that the expenditures did not increase the value or productive capacity of the mine.

(1) *Recession of the working faces.* With respect to the first contention of the defendant, the expenditures seem clearly to fall within the ambit of Marsh Fork Coal Co. v. Lucas, 42 F.2d 83, 84 (4th Cir. 1930).[1] The Marsh Fork was

1. In line with the Marsh Fork case, a number of decisions have held that equipment similar to that considered in Marsh Fork, purchased in order to compensate for the increased distance between the working faces and the working plant were deductible from gross income, where the equipment did not add to the value of the mine, did not decrease the cost of production, and did not restore property or make good the exhaustion thereof for which an allowance was made. See United States v. Roden Coal Co., 39 F.2d 425 (5th Cir. 1930); Winding Gulf Colliery v. Brast, 13 F.Supp. 743 (N.D.W.Va.1936), aff'd, 94 F.2d 179 (4th Cir. 1938); Enterprise Coal Co. v. Phillips, 12 F.Supp. 49 (M.D. Pa.1935), aff'd per curiam, 84 F.2d 565 (3rd Cir. 1936). See also Levy & Simonds, "Capitalization of Mining Expenditures," 26 Taxes 203 (1948), for a review of the decisions in this area from 1924 to 1948.

In addition, a variety of equipment somewhat different from that involved in Marsh Fork has been approved as receding face purchases. See United States v. Roden Coal Co., supra (Enlargement of water pipes to handle increased volume of water encountered with greater depth of workings); New Pittsburgh Coal Co. v. United States, 200 F.2d 146 (6th Cir. 1952) (Track for temporary storage of empty available cars to avoid threatened curtailment of production in face of car shortage); Roundup Coal Mining Co. v. Commissioner, 20 T.C. 388 (1953) (Air shaft, fan, and compressor, necessary to serve advanced working faces); West Virginia-Pittsburgh Coal Co. v. Commissioner, 24 B.T.A. 234 (1931) (Mining machines, transformers to serve additional substations, motor generator and transmission lines to supply more power needed for more necessary equipment, fans and vents, all required as the area of the mine increased and the working places became more scattered); W. M. Ritter Lumber Co. v. Commissioner, 30 B.T.A. 231 (1934) (Mining equipment needed to serve scattered working places); Tennessee Consolidated Coal Co. v. Commissioner, 24 B.T.A. 369 (1931) (Portable air compressor); Preston County Coke Co. v. Commissioner, 24 B.T.A. 646 (1931) (Mining machines, bending machines, fan, pump); Little War Creek Coal Co. v. United States, 25 F. Supp. 764 (S.D.W.Va.1938) (Mine pump, filing cabinet).

Among the equipment claimed as receding face purchases but ruled to be capital expenditures (in addition to the equipment involved in Commissioner of Internal Revenue v. H. E. Harman Coal Co., discussed at a later point in the text) are the following: Roundup Coal Mining Co. v. Commissioner, supra (Rock slope constructed in new area, for the benefit of future production, and not connected to mine workings for several years); W. M. Ritter Lumber Co. v. Commissioner, supra (Tipple alterations which improved quality of output, although it did not increase normal production); Franklin Coal Mining Co. v. United States, 15 A.F.T.R. 860 (N.D.Ala. 1932) (Power line replacement which increased output by preventing further shutdowns caused by repeated failure of old line); Preston County Coke Co. v. Commissioner, supra (Coke machine and steam shovel used not in mining but in manufacturing process); Caflisch Lumber Co. v. Commissioner, 20 B.T.A. 1223 (1930) (Extension of railroad track to make more timber available, not to maintain production because tract not fully developed until track laid).

is recognized as the leading case in this area and is the case upon which the treasury regulation was originally promulgated.

In Marsh Fork, the late Judge Parker held that expenditures for electric locomotives, mine cars, and steel rails were deductible from gross income for the year in which they were purchased, where the purchase of the equipment did not add, and was not intended to add, anything to the value of the mining property, its purchase was made necessary by the removal of the coal and the recession of the working faces, and its installation was merely an expense incident to the removal of the coal. In so holding, Judge Parker stated, in part, the following:

"Ordinarily it is true that the purchase of machinery having a life greater than one year is to be charged to capital and not to expense, for ordinarily such machinery is purchased either to increase production or to decrease cost and in either event to add to the value of the property. Expenditures such as those here involved, however, are not made either to increase production or to decrease cost of operation. They do not add to the value of the property, and are not made for that purpose. They are made solely for the purpose of maintaining the capacity of the mine as the working faces of the coal recede. They represent the cost, as it were, of bringing forward the working plant of the operator, which is made necessary as the coal is removed from the mine and the tunnels increase in length.

"It is possible, of course, to think of the increased trackage and the increased number of mine cars and locomotives made necessary by the lengthening tunnels as an increase of the capital investment in the mine; but the trouble is that this theory leads to the ridiculous result that, with the increase of investment the property becomes less valuable, and that, when the investment is complete, the property is practically worthless. It is much more reasonable, we think, to consider expenditures for trackage, cars, and locomotives to maintain normal output as being an expense necessitated by the removal of the coal which has lengthened the tunnels, and an expense which, in any fair system of accounting, should be charged against the coal so removed.

"When an operator has removed sufficient coal to extend his tunnels so that he cannot maintain production with the equipment which he has, he must as a matter of course lay down more track and put in more cars and locomotives. The question is, Shall the expense thereby incurred be charged against the coal, the removal of which necessitated the expenditure to maintain normal operation, or against the coal yet unmined? We think it is but fair to charge against the coal which has been mined the expense which its removal has necessitated. We think, also, that this is the only practicable method of accounting. To capitalize the expenditures made to maintain normal output means that the cost of removal is pyramided against the coal farther back in the mine, with the result that the coal nearest the head house will appear to have been mined at abnormal profit and that farther back at a loss." 42 F. 2d at 84–85.

The expenditures for the Plasterco mine, like those in Marsh Fork, represent the cost of "bringing forward the working plant of the operator," made necessary as the mineral is removed from the mine. In Marsh Fork, the removal of ore caused a lengthening of the existing tunnels, while in the present case the removal of ore caused the mining to progress to new, lower tunnels. It does not seem logical, however, to hold that where an ore deposit can be mined at one level, in one tunnel which is increased in length as the ore is removed,

expenditures to bring forward the working plant of the operator can be expensed, but that where the deposit must be mined at various levels, the cost of bridging the gap between the working plant and the lower levels cannot be expensed. It is true in both instances that "with the increase of investment, the property becomes less valuable, and that, when the investment is complete, the property is practically worthless." 42 F.2d at 85. And, again, in both instances, it is more reasonable "to consider [such] expenditures * * * as being an expense necessitated by the removal of the coal which has lengthened the tunnels [or, as here, by the removal of gypsum at the upper levels], and an expense which, in any fair system of accounting, should be charged against the [ore] so removed." Ibid.

The defendant relies upon four cases to establish that expenditures for the mining of "new areas" are not properly receding face expenditures. All of these cases, however, are distinguishable from the present case.

Roundup Coal Mining Co. v. Commissioner, 20 T.C. 388 (1953), denied as a receding face expenditure the cost of constructing a rock slope claimed for the years 1945 and 1946, but not connected to the mine workings until 1950. The court held that there was no relation between the maintenance of production in 1945 and 1946 and the construction of the rock slope. The court stated that the rock slope was driven in new and undeveloped territory beyond the then existing mine workings, and was for future production.

Repplier Coal Co. v. Commissioner, 140 F.2d 554 (3rd Cir. 1944), denied as a receding face expenditure the cost of driving a tunnel into a new area making available 394,000 tons of coal for production. The plaintiff, however, did not claim the tunnel as a receding face expenditure under the treasury regulation until the plaintiff was before the Court of Appeals. That court held, under Dobson v. Commissioner, 320 U.S. 489, 64 S.Ct. 239, 88 L.Ed. 248 (1943), that it could not disturb the finding of fact of

the Tax Court that the expenditure was a capital expenditure. (The Dobson rule was discarded by Pub.L.No.773, 80th Cong., 2d Sess. § 36 (1948), 62 Stat. 869, 28 U.S.C. § 1 et seq.) Before the Tax Court, the plaintiff had relied upon G. C.M. 13954, XIII–2 Cum.Bul. 66 (1934), and urged that the cost should be deducted as a deferred operating expense. Apparently, the plaintiff was contending that the expenditure constituted a development expenditure incurred after the production stage was reached; the opinion in G.C.M. 13954 ruled that development expenditures at that stage should be treated as deferred operating expenses. (For a discussion of this ruling of the Repplier case, as altered by the Revenue Act of 1951, see Alexander & Grant, "Mine Development and Exploration Expenditures," supra.)

Guanacevi Mining Co. v. Commissioner, 127 F.2d 49 (9th Cir. 1942), held that the cost of two haulage tunnels driven into ore bodies previously worked on the surface were capital expenditures. The plaintiff relied not upon the receding face regulation, but upon G.C.M. 13954; the plaintiff claimed not a current deduction, but a deduction as deferred operating cost allocated to the years in which the ores were extracted. The court ruled that the expenditures were capital, as no ore had been mined for several years before the tunnels were driven, and the tunnels were to attain an output and not to maintain output.

Alsted Coal Co. v. Yoke, 200 F.2d 766 (4th Cir. 1952), decided by Judge Parker, held that expenditures for opening a mine which had not been worked for seventeen years were development expenditures to be capitalized. They were made to attain output, not to maintain output. He further held that the same expenditures (e. g., clearing debris, retimbering, pumping water) were operating costs after the mine had reached the production stage.

None of the above decisions supports the defendant's position that facilities in a "new area" of mining cannot qualify as receding face expenditures. In Roundup,

a "new area" was involved, but the facility was found unrelated to maintenance of production for the years in question or for several years thereafter. In Repplier, neither the Court of Appeals nor the Tax Court passed upon the contention that the tunnel was a receding face expenditure; moreover, a tunnel seems properly to be classified as a development expense, and not as mining equipment which may qualify as a receding face item. G.C.M. 13954 treats tunnels as development expenditures, and as noted above, the Internal Revenue Code of 1939 also distinguishes between mine development expenditures and depreciable property. See also Alexander & Grant, "Mine Development and Exploration Expenditures," supra, which distinguishes between development expenditures and expenditures for depreciable mine equipment. In Guanacevi, a receding face expenditure was not in issue, and in Alsted, although the treasury regulation was set forth in the decision, there was no discussion of any claim that the expenditures fell thereunder. It seems proper to consider the last three cases as concerning the distinction, important for years prior to 1951, between development expenditures in the development stage of the mine, made to attain output, and development expenditures during the production stage, made to maintain output. Therefore, these three cases have little relevance to the case at hand.

█ It appears that no case has expressly determined whether the receding face regulation allows as expense items expenditures for facilities to serve "new areas" of mining. It seems logical under the reasoning of the Marsh Fork decision, however, that such items may be expensed where in the normal course of the mining out of a deposit, new faces are reached, and where the distance of the new faces from the working plant of the operator necessitates bringing forward that plant.

Moreover, it appears that the mining of "new areas" was actually involved in the Marsh Fork case; it can be said that mining has proceeded into a "new area" when a tunnel is lengthened, more tracks are laid into the expended tunnel, and mining progresses into the extended portion of the tunnel.

The defendant stresses that "new faces" were being worked at the lower levels of the Plasterco mine. It seems clear, however, that the working faces change in the course of any mining operation, including those in Marsh Fork (to the extent that it can be determined from the facts as stated in the opinion). The faces worked at the end of a tunnel are not the same as those worked earlier, unless perhaps the deposit happens to be a solid block of ore.

█ It appears, too, that the language "recession of the working faces of the mine," used in the treasury regulation, logically includes the normal progress of mining from one working face to the next, as well as the simple recession of a given working face from one location to another as it is mined. If the language did not include this type of progress of a mine, the result would be to grant expensing of items on the arbitrary basis of the particular character of the mine deposit worked; the mining of a solid ore block would be less expensive than the mining of a deposit having various outcroppings of ore. So to interpret the receding face regulation would lead to holdings bearing no relationship to the considerations set forth in Marsh Fork, or to the peculiar circumstances of the mining industry's equipment requirements. (For a discussion of these circumstances, and the recognition thereof by the treasury regulation, see Carson, "Tax Problems of the Mining Industry," supra at 336 (1951).)

(2) *Effect of the expenditures upon the value and productive output of the mine.* The defendant contends that the plaintiff has not established a prima facie case as to the effect of the expenditures on the value of the mine or the cost of production of mineral units. A prima facie case, however, has been made on these points

The plaintiff introduced exhibits showing figures for the various mines, including the Plasterco mine, concerning maximum yearly capacity (computed by multiplying by twelve the production for the month of the year in which the highest production was achieved), actual production, cost per ton of production, and tons per man hour of production, for the years 1950 through 1955. These show, for the Plasterco mine, only a slight increase in "maximum yearly capacity" for the years 1953 through 1955, and a slightly greater increase in actual production for these years.

The defendant states that these figures are not useful because they are affected by market conditions, labor costs, etc., and do not isolate the effect of the expenditures in question upon the production of that part of the mine benefited. The defendant's position is in part well taken, but it does not destroy the plaintiff's case.

■ It is indicated by the language of the treasury regulation, which speaks of the value of the *mine*, as well as by the decisions, that the effect of the expenditures on the mine as a whole is the question to be determined. See United States v. Roden Coal Co., 39 F.2d 425, 426 (5th Cir. 1930); West Virginia-Pittsburgh Coal Co. v. Commissioner, 24 B.T.A. 234 (1931). No case has come to our attention which indicates to the contrary.

The defendant states that actual production figures, affected by market, labor and other conditions, cannot show whether an expenditure has increased the potential capacity of the mine. Such figures, as here presented, when considered along with the testimony in this case, however, seems satisfactory. In West Virginia-Pittsburgh Coal Co. v. Commissioner, 24 B.T.A. at 237, the Board of Tax Appeals stated: "The normal daily output *capacity* of a mine is the productive capacity of the mine *as demonstrated in actual production* and as contemplated by the predesigned machinery and the equipment incident to the operation." (Emphasis supplied.)

In addition to the figures concerning mine production for 1950–1955, the plaintiff's witness Appleyard, who was familiar with the mines and with the particular expenditures themselves and why they were made, testified that the expenditures at Plasterco did not increase the productive output or capacity of the mine, but were made only to enable the company to maintain the original designed output of the mine, even though it was going a greater distance for the ore. We are satisfied from the proof that these expenditures meet the conditions of the treasury regulation.

*Gypsum, Ohio Mine*

1. 1952 expenditure for the construction of an air and escape hatch: $42,396.

During the tax year 1952, the plaintiff owned and operated a gypsum mine at Gypsum, Ohio, and during 1952 the plaintiff expended $42,396 for the construction of a new air and escape hatch.

In 1951, the mineral in the area of the mine then being worked was nearing depletion. A double set of tunnels was driven as a development entry into a new area adjacent to that which had been worked. It was necessary to drive these tunnels in order to go beneath tracks of the New York Central Railroad; the plaintiff was permitted to excavate no more than these two tunnels under the tracks. On the far side of the tracks, the plaintiff installed an air and escape hatch, completed in 1952, to serve the new advanced areas. The state mining law required an opening on that side of the railroad to serve as an emergency escapeway in the event of a mine disaster.

■ This expenditure fails to qualify as a receding face expenditure, under the treasury regulation. It was not necessitated solely by the recession of the working faces of the mine, but rather was necessitated by the presence of the tracks of the New York Central Railroad and the need to provide air and escape facilities on the other side of those tracks.

Marsh Fork and Commissioner of Internal Revenue v. H. E. Harman Coal Corp., 200 F.2d 415 (4th Cir. 1952), also decided by Judge Parker, make it clear that an expenditure qualifies as a receding face deduction only when it is necessitated solely by the recession of the working faces of the mine. See also United States v. Amherst Coal Co., 272 F.2d 930, 934 (4th Cir. 1959).

In the Harman case, Judge Parker stated of the expenditures there in issue: "They have been necessitated not by the removal of the coal during the years in which they were made but by the thinness of one of the seams, the radical change in the nature of another and the shortage of available manpower." And further, "We do not think it determinative that the mine had been developed to full capacity prior to 1944 or that the equipment was purchased in an effort to maintain production. The thin seam of coal, the greater amount of slate and other refuse encountered as a result of the change in the character of the seam being mined and the increasing difficulty of obtaining manpower necessitated additional capital investment as additional mechanization was required for the proper working of the mine; and there is no reason why such investment should be charged against the coal mined during the current year instead of being amortized like other capital investments made in the interest of economy and efficiency." 200 F.2d at 418–419. The court found that they "unquestionably added to what the value of the mine would have been without them and they decreased 'the cost of production of mineral units' ✦ * *."

In the case at bar, it was not the removal of gypsum that caused the need for the air and escape hatch, except to the extent that its removal caused the plaintiff to proceed into the area crossed by the railroad tracks. It appears from the testimony, although it was not specifically so stated, that whether the tracks had been near the original workings of the mine, or distant therefrom, a hatch on the far side of these tracks was required for safety by state mining law. It was not, therefore, merely the distance of the working places from the location of other hatches which caused the need for this facility. Apparently, the hatch would not have been required to serve this area had it not been for the presence of the tracks.

As noted in both Marsh Fork and Harman, items of equipment with a useful life of more than one year ordinarily are chargeable to capital account and recovered through depreciation, because they add to the value of the business. The air and escape hatch clearly added to the value of the mine in permitting operations to proceed in the area beyond the tracks. Additional capital investment was required to provide for the safety of the men working in that area.

It is true that if this hatch had been required solely because of the distance of the workings from hatches serving areas worked earlier, it could be expensed as a receding face item. Roundup Coal Mining Co. v. Commissioner, 20 T.C. 388 (1953). In that event, it would not be regarded as adding value to the mine, for under the considerations set forth in Marsh Fork, where the expenditure is necessitated by the removal or ore, the facility contributes no balance of economic value to the mine. Those considerations, however, are inapplicable here.

### Plaster City, California Mine

1. 1952 purchase of a new power shovel: $75,103.

2. 1953 expenditure to convert a churn-type drill to a wagon-type drill: $4,248.

The plaintiff's mine at Plaster City, California, is an open pit mine or quarry, employing a bench method of mining. In 1945, and for several years thereafter, the excavation proceeded at the "toe" of the mountain or hill of gypsum, and one shovel was employed to pick up and load into trucks the gypsum blasted away from the face. In 1951, a second face was opened at a level higher than the original floor level, and in subsequent

years several different faces, or benches, were opened. In 1952, a second shovel was purchased, at a cost of $75,103. After the bench operation commenced, the original shovel had to spend a lot of time in establishing benches, and it had to be moved from one bench to the other. A second shovel was therefore required to compensate for the time so lost, and to maintain the normal output of the mine.

There were two reasons why a change was made from the single face operation to a bench operation. First, state mining law limits the height of the face which can be carried, for reasons of safety of operation. Second, the floor of the deposit had an upward slope. The change to a bench operation was in part in anticipation of this rise in the floor of the deposit.

In 1953, a churn drill which had been used at this mine was converted to a wagon-type drill. Prior to 1953, the churn drill was used to drill holes down into the gypsum. The holes were then loaded with explosive and the material thereby blasted off of the working face. The force of the explosive plus the fall of material from a considerable height broke the rock up into the desired size for loading with the shovel. In 1953, the faces being worked were no longer 50 to 100 feet high, but were 25 to 30 feet high. To maintain the same ratio of explosive to tons of rock broken, and to get the same fragmentation of the material at this reduced height, it was necessary to drill smaller diameter holes and to drill them closer together. The churn drill could not accomplish these objectives, hence one was converted to a wagon-type drill, suitable for this purpose, at a cost of $4,248.

■ The expenditures for the power shovel and drill conversion fail to qualify as receding face expenditures. They were not necessitated solely by the recession of the working faces of the mine, but rather were required by the need to convert from a single face to a bench operation when the single face became too high to mine safely as one face, and

to anticipate a rise in the floor of the deposit.

The rationale of the Harman decision, as discussed above, applies to these expenditures. In Harman, special equipment was required to work a thin seam of coal encountered in the mining. Here, additional equipment was needed to work the face when it became too high to carry as a single face.

In addition, it should be noted that in the Harman case, the court denied as expense items certain Joy loaders and cutting machines which were added to the mine as the working faces scattered and became farther apart from one another. The Tax Court stated in its findings of fact, set forth in footnote 1 of the Harman decision, 200 F.2d at 416–417: "In so far as the cutting and loading machines * * * are concerned, it makes no difference how far the tipple is located from the working place in the mine. The distance between two working sections is determinative of the number of cutting and loading machines needed."

The shovel here claimed by the plaintiff, like the equipment described by the Tax Court, was required because of the inefficiency of using only one shovel on more than one face. Recession of the face away from the working plant did not cause the need for the shovel. It was required in the interest of economy and efficiency, to avoid moving one shovel back and forth between the faces, and not solely because of the recession of the working faces of the mine away from the plant of the operator.

It should be noted, although the plaintiff did not rely upon these decisions, that in West Virginia-Pittsburgh Coal Co. v. Commissioner, 24 B.T.A. 234 (1931), and W. M. Ritter Lumber Co. v. Commissioner, 30 B.T.A. 231 (1934), equipment required to avoid shifting machines on hand from one face to another, as the working faces became scattered, was allowed to be expensed. These cases, in this respect, seem inconsistent with Harman. The Harman case, however, seems the better authority.

As to the drill conversion, this expenditure is similar to that in Harman required where the petitioner's regularly used equipment was inappropriate for use on a thin seam of coal. The churn-type drill was inappropriate for working a short face.

*Fort Dodge, Iowa Mine*

1. 1952 expenditure for construction of a new roundhouse: $26,893.

2. 1952 purchase of a new tractor carry-all: $26,500.

3. 1953 expenditure for construction of a new powder magazine: $3,119.

The plaintiff's mine at Fort Dodge, Iowa, is an open pit mine or quarry. The gypsum deposit is a flat bed with 40 to 50 feet of overburden or earth cover, which is stripped off to mine the gypsum. In 1952, the working face of the mine was advancing in the direction of a powder magazine and a roundhouse located on the overburden. These had to be removed to allow the continued advance of the face. At the time of their removal, the structures were still good buildings, with ten or fifteen years of life remaining. It was considered more economical, however, to replace these buildings with new ones in different locations than to tear them down and move them piecemeal.

A new roundhouse was constructed in 1952 at a cost of $26,893, and a new powder magazine was constructed in 1953 at a cost of $3,119.

■ The expenditures for construction of the new roundhouse and powder magazine were necessary to maintain the normal output of the mine solely because of the recession of the working faces of the mine, and did not increase the value of the mine, decrease the cost of production of mineral units, or represent an amount expended in restoring property or in making good the exhaustion thereof for which an allowance is or has been made. These facilities merely replaced former like facilities which had to be torn down because of the recession of the working face. They qualify as receding face deductions under the treasury regulation.

It seems clear that if the recession of the working face had been away from these buildings, instead of toward them, moving them or building new ones closer to the face would have qualified as receding face expenditures. Like the air shaft held deductible in Roundup Coal Mining Co. v. Commissioner, 20 T.C. 388 (1953), and the portable air compressor held deductible in Tennessee Consolidated Coal Co. v. Commissioner, 24 B.T.A. 369 (1931), these buildings were necessary to serve the working faces of the mine. The result should not logically be different where the face has receded in the direction of these buildings, rather than away from them.

The new buildings were comparable to the old ones in size and structure, not significantly improved facilities. They served a new face in addition to the old one; there is no indication, however, that they were larger or more expensive to construct by reason of their serving an additional face.

In 1952, a tractor carry-all, or earth-moving machine, was purchased for this mine, because it became necessary in that year to open a second working face in order to continue with the normal mining out of the deposit. The second face was located in 1952 at a point near the original location of the first face. Both of these faces are still being worked.

■ The purchase of this carry-all fails to qualify as a receding face deduction. The plaintiff has failed to establish with respect to this expenditure (1) that it was necessitated solely because of the recession of the working faces of the mine, and (2) that its purchase was merely to maintain the normal rate of output of the mine, and did not increase the value or output of the mine.

There is no testimony in the record which indicates that this purchase was necessitated by the recession of working faces away from the working plant of the mine. In the plaintiff's reply brief, it is stated that if the first face had never

receded from its original position, the earth-moving machine which served the first face could have served the second face as well, with no loss of efficiency; but that in light of the recession of the first face, moving this machine back and forth between the two faces would have resulted in a loss of time and production. There is no testimony in the record, however, concerning the earth-moving machine to which the plaintiff has referred in its brief, or suggesting that this machine could have served both faces. Moreover, it appears under the Harman decision that where additional machinery is required because of the "scattering" of the working faces, the acquisition of additional machinery for such faces is not properly a receding face expenditure.

The plaintiff's witness Appleyard testified that it was necessary to open the second working face, for which the tractor was acquired, in order to continue the normal mining out of this deposit; however, he also stated that from the time the second face was opened in 1952, both the first and second faces have continued to be worked. There is no indication that the gypsum mined on the first face was being depleted or that production from that face was declining. Moreover, plaintiff's exhibit 8, showing figures concerning the Fort Dodge mine, shows a yearly increase in actual production from this mine from 1950 through 1955, a decrease in cost per ton of production for this period, and an increase in tons per man hour of production from 1951 through 1955. The evidence taken together thus fails to establish a prima facie case that the opening of the second face did not increase the output of the mine or its value.

### Southard, Oklahoma Mine

1. 1952 purchase of a new portable air compressor: $5,262.

The plaintiff's mine at Southard, Oklahoma, is an open pit mine or quarry. Compressed air for the working faces was provided at a compressor station. In 1952, the "Keenes working trace" in the upper strata of the gypsum deposit at this mine was being depleted, and it was necessary to open a second face in this strata at a point about a mile and a quarter distant from the older face. In order to provide compressed air for drilling in the new area, it was necessary either to build a pipeline to carry air from the compressor station or to locate a portable compressor at the new working face. A portable air compressor was purchased to serve the new face, at a cost of $5,262.

This expenditure was necessary to maintain production solely because of the recession of the working faces of the mine, and did not increase the value of the mine, decrease the cost of production of mineral units, or represent an amount expended in restoring property or in making good the exhaustion thereof for which an allowance is or has been made.

This expenditure is similar to the expenditure for a new ore pocket, hoist motor, and skips at the plaintiff's Plasterco mine, in that it was necessitated when the normal progress of the mining out of the deposit led to the opening of a new face at a greater distance from the working plant of the mine. The acquisition of the portable air compressor was to "bring forward the working plant of the operator," and it was occasioned by the prior removal of gypsum.

### Midland, California Mine

1. 1953 purchase of a new portable air compressor: $9,062.

There is no evidence in the record concerning the purchase or purpose of the portable air compressor claimed for the Midland mine. It therefore must be denied as a receding face expense.

### III. JUDGMENT OF THE COURT.

Judgment should be entered in favor of the plaintiff on the following claimed receding face deductions:

### Plasterco, Virginia Mine

1. 1953 expenditure for construction of a new ore pocket: $118,130.
2. 1953 purchase of a new hoist motor and skips: $59,801.

*Fort Dodge, Iowa Mine*

1. 1952 expenditure for construction of a new roundhouse: $26,893.
2. 1953 expenditure for construction of a new powder magazine: $3,119.

*Southard, Oklahoma Mine*

1. 1952 purchase of a new portable air compressor: $5,262.

Judgment is denied the plaintiff with respect to the following claimed receding face deductions:

*Gypsum, Ohio Mine*

1. 1952 expenditure for the construction of an air and escape hatch: $42,396.

*Plaster City, California Mine*

1. 1952 purchase of a new power shovel: $75,103.
2. 1953 expenditure to convert a churn-type drill to a wagon-type drill: $4,248.

*Fort Dodge, Iowa Mine*

1. 1952 purchase of a new tractor carry-all: $26,500.

*Midland, California Mine*

1. 1953 purchase of a new portable air compressor: $9,062.

Judgment will be entered in favor of the plaintiff in respect of the following amounts, as agreed by the defendant:

1. A deduction from gross income for 1953 in the amount of $517.61.
2. A deduction from gross income of $1,387.29 for 1953.
3. A deduction from gross income of $622,100 for 1953.
4. A deduction from gross income of $20,244 for 1952.

Counsel requested at the trial that they be permitted to compute the amount of judgment and submit a judgment order for the court's approval after the court had ruled upon the various items claimed as deductions by the plaintiff. The judgment order will reflect the provisions of the stipulation filed by the parties with the court on February 9, 1960, concerning adjustments in the judgment order necessary to reflect any decrease in the plaintiff's gypsum depletion deduction for 1952 made necessary by a determination that any of the items claimed by the plaintiff as receding face deductions for 1952 qualified as such.

Counsel are requested to confer and to submit a judgment order in keeping with the views herein expressed on March 19, 1962, at 10 A.M.

This memorandum shall stand as the court's findings of fact and conclusions of law required under the provisions of Rule 52 of the Federal Rules of Civil Procedure, 28 U.S.C.