**UNITED STATES of America,**
**Appellant,**

v.

**AMHERST COAL COMPANY, formerly**
**Logan County Coal Corporation,**
**Appellee.**

**No. 7952.**

United States Court of Appeals
Fourth Circuit.

Argued Nov. 11, 1959.

Decided Dec. 15, 1959.

Arthur I. Gould, Attorney, Department of Justice, Washington, D. C. (Charles K. Rice, Asst. Atty. Gen., Lee A. Jackson and A. F. Prescott, Attorneys, Department of Justice, Washington, D. C., and Duncan W. Daugherty, U. S. Atty., Huntington, W. Va., on brief), for appellant.

Homer A. Holt, Charleston, W. Va. (Jackson, Kelly, Holt & O'Farrell, Charleston, W. Va., on brief), for appellee.

Before SOPER and BOREMAN, Circuit Judges, and THOMSEN, District Judge.

THOMSEN, District Judge.

This is an appeal by the government from a judgment in favor of taxpayer in an action to recover income taxes paid for the year 1951, alleged to have been erroneously assessed. The issue is whether taxpayer must capitalize certain expenditures made during that year for electrical substations, power lines and transformers in its Lundale Mine, or may treat them as ordinary and necessary business expenses under T.R. 111, sec. 29.23(m)–15(b).[1] That issue, in this case, turns upon whether the expenditures were "necessary to maintain the normal output solely because of the recession of the working faces of the mine", and whether they either "increase[d] the value of the mine" or "decrease[d] the cost of production of mineral units", as those terms are used in the regulation.[2]

The case was heard by the late Judge Ben Moore without a jury. A few days before his death he wrote an opinion letter, in which he said that he did not think it was necessary to "recite the general and underlying facts of the case, which are not in dispute between the parties", and that it was "sufficient for the present purpose [to] make findings of fact on disputed questions and state conclusions of law". This he did, as follows:

"Findings of Fact

"(1) The Lundale mine was a one unit operation, both as to the part situate in Logan County and the part situate in Wyoming County.

"(2) This mine had been fully developed prior to the expenditures in question in this case.

"(3) The work done in producing coal in 1950, 1951 and 1952 from that portion of the mine lying in Wyoming County was an extension of the working faces of the mine, and caused a recession of the working faces.

"(4) The installations, expenditures for which are in question in this case, were necessary to maintain the normal output of the mine, and were made so solely because of the recession of the working faces thereof.

"(5) These installations did not increase the value of the mine, nor did they decrease the cost of production of mineral units, nor did the cost thereof represent an amount expended in restoring any property or in making good the exhaustion thereof for which an allowance was or had been made.

1. "Sec. 29.23(m)–15. *Allowable Capital Additions in Case of Mines.*—(a) All expenditures in excess of net receipt from minerals sold shall be charged to capital account recoverable through depletion while the mine is in the development stage. The mine will be considered to have passed from a development to a producing status when the major portion of the mineral production is obtained from workings other than those opened for the purpose of development, or when the principal activity of the mine becomes the production of developed ore rather than the development of additional ores for mining.

"(b) Expenditures for plant and equipment and for replacements, not including expenditures for maintenance and for ordinary and necessary repairs, shall ordinarily be charged to capital account recoverable through depreciation. Expenditures for equipment (including its installation and housing) and for replacements thereof, which are necessary to maintain the normal output solely because of the recession of the working faces of the mine, and which (1) do not increase the value of the mine, or (2) do not decrease the cost of production of mineral units, or (3) do not represent an amount expended in restoring property or in making good the exhaustion thereof for which an allowance is or has been made, shall be deducted as ordinary and necessary business expenses."

2. The government concedes that they "do not represent an amount expended in restoring property or in making good the exhaustion thereof for which an allowance is or has been made".

**932**

"Conclusions of Law.

"(1) Plaintiff had the right under Regulation 111, Section 29.23(m)–15 to deduct the cost of the installations on its income tax return for the year 1951, as an ordinary and necessary business expense.

"(2) Defendant was in error in requiring plaintiff to treat the cost of these installations as capital expenditures.

"(3) Plaintiff is therefore entitled to a refund of the taxes erroneously assessed and collected from plaintiff, as set out in its complaint, with interest   *   *   *."[3]

There is no serious dispute about the first three findings of fact; they are amply supported by the evidence. The fourth and fifth findings, however, are phrased in the language of the regulation, and depend upon basic facts which are seriously disputed and as to which the district judge made no findings.

Both sides have argued the case as though all of the items in dispute must be treated alike, either as allowable deductions or as capital expenditures. Since we do not agree that they must be so treated, we are remanding the case for a new trial, in order that the district court may consider any additional evidence which may be adduced and may make additional findings of fact with respect to the several items. After hearing argument on the point, the district court may conclude from the evidence that some items should be capitalized and some allowed as expenses deductible during the year 1951.

The lands operated by taxpayer as the Lundale Mine in 1951 included: two tracts leased from Pardee Land Company, which accounted for over 50% of the mine's total coal production; two tracts leased from others; and the land at Lundale on which the portal and the tipple were located, owned by taxpayer. The several tracts are contiguous and were operated as a single mine.

We are concerned with the two Pardee tracts. Together they form roughly a pie-shaped wedge, with the apex at the north near the tipple (marked (A) on the maps offered in evidence) almost four miles from the outer rim. The line between Logan County on the north and Wyoming County on the south follows the top of a ridge which crosses the wedge about two-thirds of the way from the apex to the rim. The Logan County tract (2,156 A.) has been under continuous lease to taxpayer since 1914. The Wyoming County tract (c. 2,200 A.) was originally leased to taxpayer in 1926; most of that tract (2,047 A.) was released by taxpayer in 1941, but in 1949 Pardee gave taxpayer an option to lease the 2,047 A. again, and taxpayer exercised that option on January 1, 1951.

Before 1937, while the mining operations were relatively near the portal and the tipple (A), an electrical substation (B), located near the tipple, provided power for the underground operations, converting power purchased at 4,000 volts AC from Appalachian Electric Power Company to 250 volts DC for underground use. The substation also provided 440 volts AC for use at the tipple. By 1937 the working faces had receded so far that a 4,000 volt AC line (F) was constructed above ground, running 12,000 ft. from the Lundale substation (B) to a borehole and an underground substation (C) in the middle of the pie-shaped wedge, some 1,600 ft. north of the county line.

From 1937 to 1951 taxpayer continued to purchase power from Appalachian at 4,000 volts AC; transformers at substation (B) continued to make available 440 volts AC for use at the tipple, and

3. The letter also contained the following paragraph: "If either plaintiff or defendant wishes to have these findings and conclusions expanded in any way not inconsistent with the purport thereof, I am willing to consider whatever suggestions may be made by either party along that line." The government moved for a new trial, which was denied by Judge Harry E. Watkins, but neither side asked to have the findings or conclusions expanded in any way.

250 volts DC for underground use. At underground substation (C) transformers and a rotary converter provided 250 volts DC for the haulage motors and mine machinery.

During the year 1948–50 some coal was being mined near substation (C), but coal was also being mined in the extreme southeast corner of the Logan County tract, so far from substation (C) that the available power was inadequate.[4] Taxpayer planned to continue mining the remaining coal in the southeast corner of the Logan County tract and to extend its operations into the Wyoming County tract, for which it had acquired an option in 1949. Little coal which could be profitably mined remained in the Logan County tract, but the development of the Wyoming County tract required the continued use of the principal haulways through the Logan County tract to the tipple (A). It was also necessary to provide an additional fan, because of the greater distances and areas to be ventilated. For these, and possibly for other reasons, taxpayer decided to purchase power at 12,000 volts rather than 4,000 volts, and to carry the 12,000 volts along the old line (F) from substation (B) at the tipple 12,000 ft. to the borehole above the old underground substation (C), then past the borehole (C) still above ground 6,400 ft. (H) to a new substation (E), located on Toney Fork, in the middle of the Wyoming County tract, where there was an outcrop of the seam. This was done in 1951. At substation (E) three 333 KVA transformers were installed, which enabled that substation to supply 440 volts AC for a large fan which was installed at the outcrop (E), and to provide 250 volts DC for underground operations in the southern and southeastern areas of the Pardee tracts. There was testimony that this power would be sufficient to develop the entire Wyoming County tract, although two additional substations, one east of (E) and one west of (E), would or might be needed in the future.

It was also necessary to enlarge substation (C) and locate it on the surface. The terrain around (C) was rough and had been undermined; for these and probably other reasons it was decided to replace substation (C) with a new substation (D), located on Tyce Fork near the western line of the Logan County lease, two-thirds of the distance from the tipple (A) to the county line, close to other property which taxpayer leased at about that time. Substation (D) was built in 1951, three 200 KVA transformers were installed, and a 4,200 ft. high line (G) was erected to carry the 12,000 volt current to (D) from the nearest point on line (F).

It was cheaper for taxpayer to buy all of its power at 12,000 volts rather than part at 12,000 volts and part at 4,000 volts. Three 500 KVA transformers were installed at substation (B) to reduce the 12,000 volts to 4,000 volts; the existing transformers at (B) further reduced it to 440 volts to serve the tipple, a cleaning plant which had recently been installed, and any other surface needs in that area. Some 250 volt DC power was also supplied from substation (B) for underground operations.

The evidence does not make clear the reason or reasons for the different capacities of the transformers at (B), (D) and (E), and why the capacity of the new transformers was so great. Again, various reasons were advanced for the particular locations selected for the new substations (D) and (E), which required costly high line construction (G) and (H).

On its 1951 income tax return, taxpayer reported the expenditures for electrical transformers as capital expenditures and claimed depreciation thereon;

---

**4.** There was evidence tending to prove that the changeover to 12,000 volts was due principally or entirely to the increased distance resulting from the receding faces. There was also evidence that a new type of loading machine had greater power requirements. These and any other facts should be considered by the district court on remand.

the expenditures for the new power lines (G) and (H) and the new substations (D) and (E) were deducted as an ordinary and necessary business expense. The Commissioner determined that the new power lines and substations were capital expenditures and allowed a depreciation deduction for these items. This resulted in an assessment of a tax deficiency, which was duly paid. Taxpayer contends in this suit that it is entitled to treat as expenses deductible in 1951 the amounts expended for the three sets of transformers, the new power lines and the substations.

Although neither side referred to the fact in its brief, it appears from the transcript that the cost of changing the 12,000 ft. line (F) from 4,000 volts to 12,000 volts was deducted as an expense in 1950 or 1951, without objection by the Internal Revenue Service. The facts with respect thereto, and the possible implications resulting therefrom, may be considered by the district court on remand.

T.R. 111, sec. 29.23(m)–15(b) is said to have been based upon the decision of this court in Marsh Fork Coal Co. v. Lucas, 4 Cir., 42 F.2d 83. The legal principles which control the instant case are set out in the Marsh Fork opinion and in Commissioner v. H. E. Harman Coal Corp., 4 Cir., 200 F.2d 415; they need not be repeated here.[5] They were applied to somewhat similar facts by the Tax Court in Roundup Coal Mining Co. v. Commissioner, 20 T.C. 388, but some of the questions in this case involve factors not heretofore considered by this court. Before passing on those questions, this court should have the benefit of detailed findings by the district court with respect to the several items and the reason or reasons for each of them. No item may be deducted as an expense unless it was necessary to maintain the normal output *solely* because of the recession of the working faces of the mine. The district court should also determine whether each such expenditure increased the value of the mine and whether it decreased the cost of production of mineral units.

Reversed and remanded.

5. The controlling statutes are the I.R.C. of 1939, sec. 23(a) (1) (A) and sec. 23(*l*) (1) and (2) as amended by sec. 121(a) and (c), Rev.Act of 1942, c. 619, 56 Stat. 798, and sec. 24(a), as amended by sec. 309(c), Rev.Act of 1951, c. 521, 65 Stat. 452, 26 U.S.C., 1952 ed., §§ 23 and 24.