**AMHERST COAL COMPANY, Plaintiff,**

v.

**UNITED STATES of America,
Defendant.**

**Civ. A. No. 1940.**

United States District Court
S. D. West Virginia,
Charleston Division.

Feb. 26, 1965.

Jackson, Kelly, Holt & O'Farrell, by Homer A. Holt, Charleston, W. Va., for plaintiff.

Louis F. Oberdorfer, Asst. Atty. Gen., Washington, D. C., and George D. Beter, Acting U. S. Atty., Charleston, W. Va., for defendant.

FIELD, Chief Judge.

This action was instituted by the taxpayer to recover the amount of income taxes alleged to have been erroneously assessed for the year 1951. The issue is whether expenditures made during that year for certain power lines, substations and transformers at plaintiff's Lundale Mine should have been capitalized or might be treated as business expenses under T.R. 111, sec. 29.23(m)–15(b). The case was heard by the late Judge Ben Moore, and in August, 1958, shortly before his untimely death, he directed a letter opinion to counsel in which he stated that he deemed it unnecessary to "recite the general and underlying facts of the case, which are not in dispute between the parties," and that it was "sufficient for the present purpose [to] make findings of fact on disputed questions and state conclusions of law." These findings and conclusions were then stated as follows:

"FINDINGS OF FACT

"(1) The Lundale mine was a one unit operation, both as to the part situate in Logan County and the part situate in Wyoming County.

"(2) This mine had been fully developed prior to the expenditures in question in this case.

"(3) The work done in producing coal in 1950, 1951 and 1952 from that portion of the mine lying in Wyoming County was an extension of the working faces of the mine, and caused a recession of the working faces.

"(4) The installations, expenditures for which are in question in this case, were necessary to maintain the normal output of the mine, and were made so solely because of the recession of the working faces thereof.

"(5) These installations did not increase the value of the mine, nor did they decrease the cost of production of mineral units, nor did the cost thereof represent an amount expended in restoring any property or in making good the exhaustion thereof for which an allowance was or had been made.

"CONCLUSIONS OF LAW

"(1) Plaintiff had the right under Regulation 111, Section 29.23(m)–15 to deduct the cost of the installations on its income tax return for the year 1951, as an ordinary and necessary business expense.

"(2) Defendant was in error in requiring plaintiff to treat the cost of these installations as capital expenditures.

"(3) Plaintiff is therefore entitled to a refund of the taxes erroneously assessed and collected from plaintiff, as set out in its complaint, with interest thereon from the date on which the erroneous assessments were paid by it."

A judgment order in favor of the plaintiff was entered by Judge Moore on September 16, 1958. On March 30, 1959, the late Judge Harry E. Watkins entered an order denying the defendant's motion for a new trial. Thereafter the Government took an appeal from both of these orders. The Court of Appeals reversed and remanded the case to this court for a new trial. United States v. Amherst Coal Company, 4 Cir., 272 F.2d 930.

In its opinion the Court of Appeals stated that there was no serious dispute about the first three findings of fact and that they were amply supported by the evidence. The court observed, however, that the fourth and fifth findings were phrased in the language of the regulation and that they depended upon basic facts which were seriously disputed and as to which Judge Moore had made no findings. The opinion pointed out several items and areas of possible inquiry and suggested that the district court should make detailed findings with respect to these items as well as the reasons for such findings.

Proceeding on the assumption that the appellate opinion affirmed Judge Moore's first three findings of fact, counsel agreed that on the remand supplemental evidence would be directed only toward the subject matter of the fourth and fifth findings. It was also agreed that the transcript of the evidence at the first trial and the records and briefs on the appeal along with the supplemental evidence might be considered by me in making the detailed findings requested by the appellate opinion. Additionally, in making these findings I have had the benefit of the briefs of counsel written in the light of the appellate observations as well as the supplemental evidence.

Findings of fact in a case such as this necessarily should be made in the light of Judge Parker's landmark opinion in Marsh Fork Coal Co. v. Lucas, 4 Cir., 42 F.2d 83. The rationale of that decision is succinctly stated at page 84 as follows:

" * * * Expenditures such as those here involved, however, are not made either to increase production or to decrease cost of operation. They do not add to the value of the property, and are not made for that purpose. They are made solely for the purpose of maintaining the capacity of the mine as the working faces of the coal recede. *They represent the cost, as it were, of bringing forward the working plant of the operator, which is made necessary as the coal is removed from the mine and the tunnels increase in length.*" (Emphasis added.)

Whether the expenditure is major or minor is not determinative, for if the expenditure squares with the principles of Marsh Fork and satisfies the requirements of the regulation it may properly be expensed rather than capitalized. See Roundup Coal Mining Co. v. Commissioner (1953) 20 T.C. 388.

In view of the nature of the remand and the several questions raised in the appellate opinion, the basic findings will be made in narrative form together with such comment as may be deemed appropriate.

### Findings of Basic Facts

The Lundale Mine, as operated by Amherst in 1951, included two principal tracts of land leased from Pardee Land Company. One tract of 2156 acres in Logan County was leased May 1, 1914. The other, containing 2200 acres in Wyoming County, was originally leased January 30, 1926. 2047 acres of this latter tract were surrendered in 1941, but were again optioned November 1, 1949 and subsequently leased on January 1, 1951. The Lundale operation also included two tracts leased from Buffalo

Creek Coal and Coke Company and Union Land Company, respectively. The portal and tipple installations of the Lundale Mine were located on property owned by Amherst. The mine was originally opened in 1912 and was a fully developed mine prior to 1951. The several tracts are contiguous and were operated as a single mine, the entire operation being served by a single ventilating system, haulage system and electric power distribution system. The operation mined only the Island Creek seam of coal which is continuous and consistent throughout all of the tracts to the outcrop. By reason of terrain and location that part of the Island Creek seam lying within the Wyoming County tract could be reached and mined only through the Lundale Mine operation. For this reason, when Amherst surrendered the 2047 acres in 1941 it was agreed that the haulageways through the Logan tract should be preserved. It was further understood between Amherst and Pardee at that time that Amherst would again lease the Wyoming tract when it became necessary in order to maintain Lundale's production. As pointed out, this was done on January 1, 1951, pursuant to the 1949 option.

Prior to 1937, when mining operations were being conducted at a relatively short distance from the portal and tipple (A) [1] at Lundale, electric power was purchased from Appalachian Power Company and metered into a substation at (B). Power was purchased at 4160 volts AC and reduced by transformers to 440 volts AC for use in the tipple operation. The substation also reduced and converted the power to 250 volts DC for use inside the mine. The effective range of 250 volt DC power underground on the conductor used by Amherst was from three to four thousand feet, and by 1937 the working faces in the Logan County tract had receded to a point beyond the effective range of the substation at (B). Accordingly, in that year a high line (F)

of 4/0 copper wire was installed to carry 4000 volts AC power from (B) some 12,000 feet to point (C). There it was taken by a bore hole down to an underground substation which by transformers and a rotary converter changed it to 250 volt DC power for underground use in both the haulage motors and mine machinery.

With the passing of the years, the working faces continued to recede, and by 1949 the Logan County coal, except for necessary pillars, was nearing exhaustion. In 1949 some coal was taken from the southwest area of the Logan tract at a point relatively close to substation (C), and mining was also conducted in the extreme southeasterly corner of this tract. This latter location was beyond the effective range of power from substation (C), and the operation was necessarily quite inefficient. By 1949, the distance from the tipple to the working face was some 3½ miles, and in addition to power difficulties, the mine had developed a severe air problem. As a temporary solution, a booster fan was installed in Dingess Hollow where No. 3 Main entry intersected the outcrop. This was done after obtaining special permission from the West Virginia Department of Mines.

While some coal from other areas went over the Lundale tipple, better than 50% of the mine's production came from the Pardee property. To continue the normal contribution of Pardee coal, it was necessary to extend the mine into the Wyoming County acreage. Accordingly, in 1950 an entry was driven to the outcrop at point (E). The location of this entry comported with sound mining practice and followed the normal progression of the Lundale Mine into Wyoming County. There was a well established haulageway from the mine portal up No. 2 Main entry to 18 Left, thence across to 2A Main and down 2A to the Wyoming entry. This haulageway had well balanced track, good

1. Various points on the map (Exhibit S-1) which was used in evidence in both trials were designated by alphabetical letters. These designations were used as reference points in the testimony as well as the opinion of the Court of Appeals. For clarity and uniformity these designations are also used in these findings.

top and provided a route to the tipple with a downgrade haul for loaded cars.

In driving the Wyoming entry, the operation extended well beyond the effective range of the 250 DC volt power from substation (C), and it became apparent that to get adequate power at the working faces as well as for the haulage motors, it would be necessary to remodel and extend the power distribution system. Amherst engaged the services of an independent firm of consulting engineers who studied the problem and recommended the plan which Amherst later adopted and installed.

In appraising this plan in the context of the issues in this case certain basic facts should be recognized. First, all underground equipment at Lundale Mine was designed to operate on 250 volt DC power. The use of DC power in the coal mining industry is historic—for one reason, it needs only two conductors and the railroad rail acts as one of these; and DC power also lends itself to the use of adjustable speed motors. However, as heretofore stated, the underground range of DC power, governed by distance, conduction size and load, was conceded by all of the witnesses to be limited to from 3000 to 4000 feet. It would have been possible to expand the effective range of this power by increasing the size of the conductor, but this would have given only limited results. Another possibility would involve running high voltage cable underground together with the use of portable rectifiers. Such a practice would have been extremely hazardous and was frowned upon by the Department of Mines. Both of these possibilities would have involved as much or more expense than the system which was recommended and installed.

Secondly, all outside equipment at the mine, including the tipple, preparation plant and ventilation system was designed to operate at 440 volts AC. It was necessary to have AC power for the operation of the ventilating fans inasmuch as the mining laws do not permit such fans to operate on DC or diesel power. To meet the various power requirements, the distribution system at Lundale prior to 1951 had been designed to accommodate power purchased from Appalachian at 4000 volts AC, and then adapted by the use of the various transformers and converters to the needs of machinery and equipment outside or underground as the case might be.

It was thus necessary for Amherst to get 440 volts AC power to point (E). That voltage could not be transmitted directly from (B) to point (E), nor could 4000 volts AC be effectively carried for that distance, the effective range of that voltage by the 4/0 high line being approximately three miles. The only solution was to increase the size of the conductor or increase the transmission voltage to 12,000 volts AC. To increase the conductor size would have been less efficient and just as expensive as the increased voltage system. It should be pointed out also that no power at a voltage intermediate of 4000 and 12,000 was available.

The installation of the remodelled distribution system was delineated in the opinion of the Court of Appeals, but the admonition of the opinion in regard to detailed findings requires that I review the installation with some particularity.

Following the recommendation of the consulting engineers, power was purchased from Appalachian at 12,000 volts AC metered at the substation at (B). The existing 4/0 high line running from (B) to (C) was adapted to carry the increased voltage merely by replacing the porcelain insulators. It was cheaper to change these insulators than to go to smaller wire between those two points. Smaller wire designed to carry 12,000 volts was then run 6400 feet overhead to point (E). Also a 4200 foot high line was installed to carry 12,000 volts to (D) from the nearest point on line (F). Having installed those transmission lines, it was then necessary to provide transformers at the points of power use, (B), (D) and (E). Under the plan the substation at (C) was moved to (D) in the manner and for the reasons set forth later in these findings. All of the existing equipment

was designed for the adaption of 4000 volts, and accordingly, transformers were necessary to effect the reduction of the line voltage of 12,000 down to 4000 volts at these use points.

Three 500 KVA transformers were installed for that purpose at substation (B). The reason for selecting 1500 KVA was that the aggregate of the existing 4000 volt transformer capacities in that area was 1275 KVA. These consisted of three tipple transformers at 600 KVA, three transformers at the portal substation of 300 KVA, three 25 KVA transformers for a hoist operation, and 300 KVA for lighting in the office and the village of Lundale. These transformers for handling 4000 volts served facilities that were in existence long before the change-over. These facilities could have continued to operate on the original transmission of 4000 volts, and the only reason for the three new transformers was to reduce to 4000 volts the line voltage of 12,000 volts necessary for adequate power transmission to point (E). The capacity of 1500 KVA was necessary to cover the existing requirements of 1275 KVA in the area of point (B) because, of necessity, the aggregate of KVA transformer potential must exceed the aggregate KVA requirements of the facilities to be operated. It was necessary to install three 500 units simply because in the mining industry transformers are not tailor-made—they are bought in standard sizes.

The appellate opinion refers to the necessity of enlarging substation (C) and locating it on the surface; and the replacement of substation (C) by a new substation at (D) "close to other property which taxpayer leased at about that time." The facts with respect to the old substation at (C) are these. Under the new installation, the substation to be located at (E) was to serve the same purpose in the pattern of production that (C) had served during the period of mining operations in the Logan County tract—that is power for face production as well as haulage. After the Logan coal was mined out there was, of course, no longer any need for face production power in that area. However, the distance from the portal to the face at (E) was some four miles, and for the most part it was upgrade, the face at (E) being some 300 feet higher than the portal. This increased haulage distance required an intermediate power source, again due to the limited underground range of 250 volt DC power. The logical location for such a source was a substation at (D) since it was approximately equidistant between the portal and (E), and also at the point of a severe grade in the haulageway. The substation (C) was not enlarged, but rather its transformer and converter equipment was merely moved to point (D) as a source of haulage power. Since the substation at (D) was installed for haulage power alone, the aggregate transformer requirements were less than would have been required at old substation (C), and the plan was designed for only 300 KVA at point (D). Amherst proposed to buy three new 100 KVA transformers but found they could buy three 200 KVA on the secondhand market with a quicker delivery at about the same price, and these were purchased and installed for that reason.

The inference that this substation was located at (D) because that point was close to other property which Amherst leased at about that time is not supported by the record. The land lying to the west of the Pardee leases was not leased nor under consideration for lease by Amherst in 1950 or 1951. Part of this land was later leased in 1956 and 1957 but the mining operations under those leases have not obtained their power from the distribution system under consideration in this case.

The observations already made herein with respect to the problems of power transmission should also demonstrate the reasons for the location of the substation at point (E). As stated, in effect this substation supplanted the old substation (C) for the purpose of supplying power for both face production and haulage in the Wyoming tract, and plainly was necessary to maintain the normal output of

the mine because of the recession of the working faces. Without this new substation and high line the Wyoming coal could not have been mined, and with the Logan coal near exhaustion, the result would necessarily have been a sharp reduction in the mine output. The "large fan" installed at the outcrop (E) in reality was the booster fan which was moved from its temporary location and installed at (E). This installation was necessary not only to serve the new entry in Wyoming County, but to bring the ventilation system for the entire mine up to an acceptable level. This again was due to the increased haulage length (four miles) which developed as the working faces receded. The bank of 333 KVA transformers was necessary to reduce the line voltage for use at the substation. The substation consisted of a 250 kilowatt rotary converter and suitable transformers to use 4160 volt AC power. This equipment was identical in size to that which formerly had been used in the substation at (C). The aggregate transformer capacity of 1000 KVA at (E) was, in fact, less than the aggregate potential at (C) under the old 4160 volt system.

The appellate opinion suggests that among other things, the district court should consider evidence that a new type loading machine had increased the power requirements. While the entry to (E) was initially driven by an 8 BU loader, the new mining machine used in area (E) was a 14 BU Joy shuttle-car unit. This replaced a Jeffrey 61 AM conveyor production unit of the type which had operated on power from substation (C) under the old power system. The 14 BU Joy unit had less connected horsepower than the Jeffrey unit, and its use placed no additional power requirements on the system.

A review of this evidence convinces me that all of the items incident to the new power system qualify as installations necessary to maintain the normal output of the mine, and made so solely because of the recession of the working faces. They were not necessary because of any change in the mining conditions other than the recession of the working face and the resultant increased haulage distance. The system was not installed to increase the power used in the operation—that remained constant at 440 volts AC and 250 volts DC. The system was installed to increase the range of power which increased range was necessitated by the recession of the working faces. In explaining this range of power, one of the witnesses pointed out that power companies use extremely high voltage for transmission over long distances, but the customers along the route don't use or obtain any higher power by reason of that voltage. It merely puts them within the range of the power system.

The Government witness, F. A. Jones, who testified before Judge Moore, stated quite frankly that 4000 volts could not have been transmitted from (B) to (E) without increasing the size of the line considerably, and that the only alternative was to step up the voltage. He further recognized the necessity for the substation and transformers at (E) as well as the intermediate haulage power at substation (D). In spite of these concessions, the witness seemed to challenge the manner in which the system was installed, but his testimony for the most part was argumentative and equivocal. The same observation could be made in regard to the other Government witness, Strojny, whose value as a witness was further diluted by his admission that he knew nothing about mining practices or underground operations.

In my opinion the preponderance of the evidence shows that Amherst was faced with a power problem created solely by the recession of the working face, and that the plan adopted and installed was the most feasible and economical method to solve the problem and provide power at those working faces.

The appellate opinion also suggests that a determination be made as to whether the installation decreased the cost of production of mineral units. The evidence indicates that it did not. Mining cost studies for the Lundale Mine,

as shown on Exhibit S–4 filed in the first trial, indicate a steady increase in per ton production cost from $1.4873 in 1940 to $5.9780 for the first four months of 1952. Additionally, William F. Miller, vice-president and secretary and treasurer of Amherst, prepared Exhibit 3 which analyzes the per ton production cost for the period from February 1, 1951, the date of the last preceding wage increase, up to the date of the power change-over (September 16, 1951) as compared to the cost for the period following the change-over up until the first of April, 1962, when the mine was closed. With no intervening change in the wage scale, this analysis shows a per ton adjusted cost prior to contributions and depreciation of $4.7350 for the period prior to the change-over as against $5.0629 after the change-over.

As a matter of logic, it would appear that once you get 250 volts DC power at the face, whether you are 2000 feet or four miles from the portal, the power factor will remain constant in the production cost equation. In the present case it appears that there was a slight increase in power cost after the change-over and this, together with the increased haulage distance, would tend to increase rather than decrease the production cost.

The appellate opinion would further seek a determination whether these expenditures increased the value of the mine. Once it has been determined that the installation did not reduce the production cost, the answer would seem to be obvious, for at 20 T.C. page 394 in the Roundup opinion, the Tax Court makes this observation:

"In the cases last above cited in Winding Gulf Colliery Co. v. Brast, 13 F.Supp. 743, affd. 94 F.2d 179, it was, in effect, established that if no decrease in the cost of production resulted from an expenditure and no portion thereof was used in the restoration or making good the exhaustion of property, no increase in value of a mine occurred within the meaning of section 24(a) (2). If in addition to the foregoing it is shown that an expenditure is brought about because of the recession of the mine working faces the amount so expended may be expensed."

In any event, the evidence is quite clear that the value of the mine as a producing unit was not increased by the installation since it had approximately the same production capacity at about the same cost after the change-over as it had before. Certainly its value after the change-over in 1951 was no more, and probably less, than it was in 1940 when it had the same production capacity with a much shorter haul to the portal. As stated by one witness: "A mine operating within 4,000 feet of the drift mouth and producing 2,000 tons of coal a day is more valuable than one operating 16,000 feet from the drift mouth and producing the same tonnage of coal." It is true that it became necessary for the operators to invest additional money to maintain production as the mine receded, but the investment did not increase the value of the operation as a producing mine.

Finally, it is necessary that I consider the possible implications arising from the handling of certain items on the 1950 and 1951 returns of Amherst. On its 1951 return, the transformers were capitalized, while the substations and power lines were treated as expense. From the evidence it appears that Mr. Kirkpatrick, former treasurer of Amherst, died in September, 1950, and was succeeded in that position by Mr. Parsons who served until February, 1952. Mr. Parsons handled the tax return for 1951 and capitalized the transformers by mistake. The mistake went unobserved until the question in regard to the entire installation was raised by the revenue agent.

In reconditioning line (F) for 12,000 volts, $2,707.92 was spent in 1950 and $715.00 was spent in 1951, and these amounts were deducted as expense items on the tax returns for those years. The testimony indicated that the examining revenue agent was furnished all of the information in regard to these expendi-

tures, and thereafter advised the taxpayer that he would allow them to remain on the books and be treated as expense items.

The explanation offered by the taxpayer's witnesses in regard to these returns was to me credible and satisfactory, and I can perceive no implications which should have an operative effect, one way or the other, on the findings to be made in this case.

In making these findings I have carefully reviewed the evidence on the first trial as well as the supplemental evidence, and in the light of the basic findings of fact made thereon, my ultimate findings and conclusions are the same as those reached by Judge Moore. These ultimate findings and conclusions are as follows:

### FINDINGS OF FACT

(1) The Lundale mine was a one unit operation, both as to the part situate in Logan County and the part situate in Wyoming County.

(2) This mine had been fully developed prior to the expenditures in question in this case.

(3) The work done in producing coal in 1950, 1951 and 1952 from that portion of the mine lying in Wyoming County was an extension of the working faces of the mine, and caused a recession of the working faces.

■ (4) The installations, expenditures for which are in question in this case, were necessary to maintain the normal output of the mine, and were made so solely because of the recession of the working faces thereof.

(5) These installations did not increase the value of the mine, nor did they decrease the cost of production of mineral units, nor did the cost thereof represent an amount expended in restoring any property or in making good the exhaustion thereof for which an allowance was or had been made.

### CONCLUSIONS OF LAW

(1) Plaintiff had the right under Regulation 111, Section 29.23(m)–15 to deduct the cost of the installations on its income tax return for the year 1951, as an ordinary and necessary business expense.

(2) Defendant was in error in requiring plaintiff to treat the cost of these installations as capital expenditures.

(3) Plaintiff is therefore entitled to a refund of the taxes erroneously assessed and collected from plaintiff, as set out in its complaint, with interest thereon from the date on which the erroneous assessments were paid by it.